**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**Rene Martin VERDUGO–URQUIDEZ,**
**Defendant–Appellee.**

**No. 87–5061.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 10, 1987.

Decided Aug. 29, 1988.

Roger W. Haines, Jr., Asst. U.S. Atty., Crim. Div., San Diego, Cal., for plaintiff-appellant.

Michael Pancer and Patrick Q. Hall, San Diego, Cal., for defendant-appellee.

Before WALLACE, NORRIS and THOMPSON, Circuit Judges.

DAVID R. THOMPSON, Circuit Judge:

Rene Martin Verdugo–Urquidez is in custody awaiting trial on twenty counts of a forty-one-count indictment returned against him and thirty-eight other defendants. The indictment charges Verdugo–Urquidez with numerous narcotics and narcotics-related criminal violations, including conspiracy to import multi-ton quantities of marijuana into the United States, possession with intent to distribute multi-ton quantities of marijuana, and engaging in an on-going criminal enterprise. Verdugo–Urquidez's presence in the United States is the result of his arrest by Mexican police officers in Mexico and his delivery by them, across the border, into the waiting arms of the United States government. Verdugo–Urquidez challenged the district court's jurisdiction over him because of the manner in which the United States obtained his custody. The district court rejected this contention, and Verdugo–Urquidez has not sought to appeal that ruling. The government appeals from the district court's order suppressing certain evidence obtained by United States Drug Enforcement Agency ("DEA") agents during their search of Verdugo–Urquidez's residence in Mexicali, Mexico.

The government raises two major arguments on appeal. First, the government contends that Verdugo–Uriquidez, a Mexican national, may not invoke the fourth amendment to the Constitution to challenge the DEA's actions in searching his Mexicali home. In the alternative, the government argues that even if the fourth amendment extends to Verdugo–Uriquidez, the evidence seized nonetheless should have been admitted because the DEA agents reasonably relied on assurances of Mexican officials that the search was permissible under Mexican law, and the search was carried out in a reasonable manner. We have jurisdiction of this interlocutory appeal under 18 U.S.C. § 3731. We conclude that Verdugo–Urquidez is entitled to the protections of the fourth amendment, and that the district court properly suppressed the evidence obtained in the search of his Mexicali residence.

I

FACTS

Rene Martin Verdugo–Urquidez is reputed to be a drug smuggler and a killer. The DEA believes him to be one of the leaders of a large and violent organization based in Mexico, which smuggles large quantities of marijuana, cocaine and heroin into the United States. The DEA also believes Verdugo–Urquidez to have participated in the brutal and revolting kidnapping and torture-murder of DEA Special Agent Enrique Camarena Salazar. If these allegations are proved true at trial, there is little doubt that Verdugo–Urquidez's conduct has placed him beyond the pale of civilized society. But in this country, a person is presumed innocent until proven guilty. We would not permit a jury to discard this fundamental precept of criminal law simply because the accused is charged with a serious crime. Likewise, we will not allow ourselves to be swayed by the DEA's suspicions, no matter how well founded, or by the government's repeated assertions, that Verdugo–Urquidez is in some way responsible for the death of Special Agent Camarena.

Since the late 1970s, the DEA has kept abreast of Verdugo–Urquidez's alleged activities as a drug smuggler. Based on an informant's tip that Verdugo–Urquidez planned to transport several tons of marijuana into the United States, the DEA filed a sealed complaint against him on August 3, 1985, charging him with various viola-

tions of the criminal laws of the United States. Based on this complaint, the United States District Court for the Southern District of California issued a warrant for his arrest. Thereafter, the DEA stepped up its investigation efforts and attempted to apprehend Verdugo–Urquidez on one of his frequent trips to the United States. Unable to locate him in this country, the DEA confirmed that Verdugo–Urquidez resided in Mexicali, Mexico, and contacted the United States Marshals Service to determine whether it would be feasible for Mexican authorities to apprehend Verdugo–Urquidez in Mexico and deliver him to the United States for trial.

In January 1986, the United States Marshals Service contacted Mexican law enforcement officers, who advised the Service that Verdugo–Urquidez could be arrested by Mexican officers in Mexico, provided there was an outstanding United States warrant for his arrest. The Marshals showed the Mexican officers the warrant for Verdugo–Urquidez's arrest. The district court found that the following events then took place: On January 24, 1986, while driving his car in San Felipe, Baja California, Mexico, Verdugo–Urquidez was stopped by six Mexican police officers, at least one of whom showed him a badge. Verdugo–Urquidez was ordered from his car, arrested, handcuffed and placed in the back seat of the Mexican officers' unmarked car. With his hands still cuffed behind his back, the police forced Verdugo–Urquidez to lie face down on the car seat, with his head covered by his jacket. For most of the two-hour ride to the Mexican-American border, Verdugo–Urquidez either lay on the seat covered with his jacket or lay there blindfolded. At no time did the Mexican police officers explain to Verdugo–Urquidez where they were going or

why he had been arrested. When the Mexican officers arrived at the border, they removed Verdugo–Urquidez from their car and walked him to where United States Marshals waited.[1] The Marshals placed Verdugo–Urquidez under arrest and drove him to the United States Border Patrol station in Calexico, California. The Marshals then phoned the DEA's resident agent in Calexico, Terry Bowen, who testified he had been waiting for the call informing him of Verdugo–Urquidez's arrest. The DEA took custody of Verdugo–Urquidez and delivered him to the Metropolitan Correctional Center in San Diego, California, where he remains incarcerated pending trial.

After the DEA took custody of Verdugo–Urquidez, Agent Bowen discussed with his fellow officers the prospect of searching Verdugo–Urquidez's house in Mexico. Agent Bowen believed that a search of Verdugo–Urquidez's Mexicali residence would disclose cash proceeds from his smuggling operations, as well as documentary evidence of those transactions, including drug ledgers and phone books listing the names and addresses of his associates. Agent Bowen also hoped that the search would disclose information relevant to the Camarena investigation. Agent Bowen contacted Walter White, the Assistant Special Agent in charge of DEA operations in Mexico. Agent Bowen and Special Agent White discussed the arrest of Verdugo–Urquidez and the possibility of a DEA search of Verdugo–Urquidez's Mexicali residence. Special Agent White told Agent Bowen that he would make some phone calls and would see what could be done.

Thereafter, Agent Bowen received Special Agent White's approval to search the Mexicali residence.[2] On January 25, 1988,

---

**1.** Soon after the apprehension and delivery of Verdugo–Urquidez to the United States, the six Mexican police officers reported to their American counterparts that they were receiving death threats and feared for their safety and that of their families. The Mexican officers and their families subsequently were permitted to enter the United States, where they now live. A formal accusation has been filed by a prosecutor in the state of Baja California, Mexico, charging the six men with kidnapping.

**2.** At no time did the DEA seek approval from the Justice Department or any United States Attorney's office for the intended search in Mexico. At no time did the DEA seek a search warrant from an American magistrate. Instead, the DEA sought the Mexican government's permission for the search of the Mexicali residence. We discuss the manner in which the DEA received this authorization to search, and details of the search itself, later in this opinion.

a team of four DEA agents drove to Mexicali, Mexico, where they met with the local commandante of the Mexican Federal Judicial Police (MFJP). With the help of several MFJP officers, the DEA searched Verdugo–Urquidez's Mexicali residence, as well as a house owned by Verdugo–Urquidez located in San Felipe, Baja California, Mexico. The search of the Mexicali residence disclosed a tally sheet, which purportedly reflects the quantities of marijuana smuggled into the United States by Verdugo–Urquidez.

Verdugo–Urquidez moved to suppress the evidence seized from his Mexicali residence. After a hearing, the court concluded that the fourth amendment to the Constitution applied to the DEA's search because it was a "joint venture" of the American and Mexican police officers. Furthermore, the court held that a foreign national is entitled to seek the suppression of evidence seized by American officers during a search conducted in a foreign country on the ground that the search violates the norms established by the fourth amendment. The district court then suppressed the evidence seized by the DEA because it concluded the search was invalid for two reasons: First, the DEA failed to seek a warrant authorizing the search. Second, even if a warrant was not required to authorize the search, the DEA's conduct in carrying out that search was not reasonable because the search was unconstitutionally general, it occurred after midnight and the DEA failed to leave a contemporaneous inventory of the evidence seized. The government appeals.

## II

## ANALYSIS

*Applicability of Fourth Amendment*

The threshold issue we confront is whether a foreign national whose foreign residence has been searched by United States law enforcement officers may challenge that search under the fourth amendment. Strangely enough, this question has not yet been answered by the Supreme Court or definitively resolved by any circuit

court of appeals. Indeed, until this case, we have been content simply to assume that the fourth amendment constrains the manner in which the federal government may pursue its extraterritorial law enforcement objectives. *See, e.g., United States v. Peterson,* 812 F.2d 486, 489 (9th Cir.1987).

1. *The Fourth Amendment Limits Government Action Abroad*

We begin our analysis with a proposition so reasonable and unremarkable that most people would find it bizarre indeed to learn that the rule has ever been otherwise:

> The United States is entirely a creature of the Constitution. Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution. When the Government reaches out to punish a citizen who is abroad, the shield which the Bill of Rights and other parts of the Constitution provide to protect his life and liberty should not be stripped away just because he happens to be in another country.

*Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1225, 1 L.Ed.2d 1148 (1957) (plurality opinion) (footnotes omitted); *see also id.* at 56, 77 S.Ct. at 1251 (Frankfurter, J., concurring in the result) ("Governmental action abroad is performed under both the authority and the restrictions of the Constitution."); *cf. id.* at 66, 77 S.Ct. at 1256 (Harlan, J., concurring in the result) ("The powers of Congress ... are constitutionally circumscribed. Under the Constitution Congress has only such powers as are expressly granted or those that are implied as reasonably necessary and proper to carry out the granted powers."). And yet, for a time, it was settled law that the Constitution applied "only to citizens and others *within* the United States, or who are brought there for trial for alleged offenses committed elsewhere, and not to residents or temporary sojourners abroad." *In re Ross,* 140 U.S. 453, 464, 11 S.Ct. 897, 900, 35 L.Ed. 581 (1891) (emphasis added). This was said to be so because "[b]y the Constitution, a government is ordained and established 'for the United States of America,'

and not for countries outside of their limits.... [Therefore, the] Constitution can have no operation in another country." *Id.* (citations omitted). The Supreme Court soon rejected this constrictive interpretation of the Constitution in favor of a more expansive vision of its reach. *See, e.g., Balzac v. Porto Rico*, 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922) ("The Constitution of the United States is in force in Porto Rico [sic] as it is wherever and whenever the sovereign power of that government is exerted."). In its *Reid* decision, the Court extended the Constitution's application to acts by the federal government in a foreign country. *Reid*, 354 U.S. at 7–9, 77 S.Ct. at 1225–26; *see also* Note, *The Extraterritorial Application of the Constitution—Unalienable Rights?*, 72 Va.L.Rev. 649, 659 (1986) ("[T]he *Reid* decision ... represents the abandonment of the nineteenth century concept of strict territoriality."). In so construing the reach of the Constitution, a plurality of the Court rejected the notion that "only those constitutional rights which are 'fundamental' protect Americans abroad." *Reid*, 354 U.S. at 9, 77 S.Ct. at 1226 (plurality opinion) (footnote omitted).

■ From these cases, a proposition of enormous vitality may be drawn: The Constitution imposes substantive constraints on the federal government, even when it operates abroad. *See, e.g.*, Saltzburg, *The Reach of the Bill of Rights Beyond the Terra Firma of the United States*, 20 Va. J.Int'l L. 741, 745 (1980) ("Wherever and whenever the [federal government] acts it relies on the Constitution as the source of its powers. Whenever it acts, it must, therefore, accept the limits on its power imposed by the ... Constitution.... Thus, the Bill of Rights controls the activities of U.S. law enforcement officers wherever they occur."). In applying these substantive constitutional constraints, it is important to recall that

> [t]he concept that the Bill of Rights and other constitutional protections against arbitrary government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to

flourish would destroy the benefit of a written Constitution and undermine the basis of our Government.

*Reid*, 354 U.S. at 14, 77 S.Ct. at 1229 (plurality opinion). Thus, in the context of this case, which involves the aggressive and laudable pursuit by the federal government of a legitimate law enforcement objective—the apprehension and prosecution of a suspected drug dealer of the worst sort—we also must take great pains to ensure that the Constitution does not become the first casualty in the "War on Drugs." *See* Wisotsky, *Crackdown: The Emerging "Drug Exception" to the Bill of Rights*, 38 Hastings L.J. 889 (1987). *See generally* Kamisar, *"Comparative Reprehensibility" and the Fourth Amendment Exclusionary Rule*, 86 Mich.L.Rev. 1 (1987).

2. *Aliens Brought to United States for Criminal Trials May Challenge Federal Government's Conduct under Fourth Amendment*

■ Having concluded that the Constitution limits the government's authority when it acts abroad, we must address the key question in this case: May a nonresident alien challenge the reasonableness of the federal government's actions under the fourth amendment? Under the facts of the present case, we hold that such a challenge may be raised.

The government's position in this case derives from a vision of the Constitution as a compact between the people of the United States and the federal government. This theory espouses the view that the Constitution should be regarded as a reciprocal arrangement between "The People" and the federal government. *See* U.S. Const. preamble ("WE THE PEOPLE of the United States ... do ordain and establish this Constitution for the United States of America."). That is, "The People" cede to their government substantial authority over them in exchange for which the government agrees to abide by the limitations imposed on it by the Constitution. Verdugo–Urquidez is a nonresident alien. The compact theory tells us, then, that because Verdugo–Urquidez is not one of "The Peo-

ple" to whom the promise of the Constitution runs, he has no right to complain of governmental action in excess of that permitted by the Constitution.

This compact theory of the Constitution has deep roots in our nation's history. The interpretation of the Constitution as a contract also has found some expression in the courts. *See, e.g., Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 471, 1 L.Ed. 440 (1793) (opinion of Jay, C.J.) ("[T]he constitution of the United States is likewise a compact made by the people of the United States, to govern themselves, as to general objects, in a certain manner."); *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 404, 4 L.Ed. 579 (1819) (Marshall, C.J.) ("The government of the Union ... is, emphatically and truly, a government of the people. In form, and in substance, it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."); *League v. De Young,* 52 U.S. (11 How.) 185, 202, 13 L.Ed. 657 (1850) ("The Constitution of the United States was made by, and for the protection of, the people of the United States."); *In re Ross,* 140 U.S. 453, 464, 11 S.Ct. 897, 900, 35 L.Ed. 581 (1891) ("By the Constitution a government is ordained and established 'for the United States of America,' and not for countries outside of their limits.... The Constitution can have no operation in another country." (citation omitted)). The compact theory also has its adherents in the academic world. *See, e.g.,* Stephan, *Constitutional Limits on International Rendition of Criminal Suspects,* 20 Va.J.Int'l L. 777, 782 (1980) (observing that there is a "long held understanding that, in general, foreign nationals abroad are neither parties to nor beneficiaries of the agreement between the federal government and its people embodied in the Constitution").

Notwithstanding these sources, we are not persuaded that the compact theory is a legitimate mode for applying the Constitution in this case. This is so for three reasons we discuss hereafter: First, the historical evidence is equivocal and many sources may be cited in support of a broader interpretation of the Constitution. Sec-

ond, the Supreme Court cases discussed above address the distinct problem of the relationship between the states and the federal government, and therefore provide little help in deciding how the federal government may act when it pursues extraterritorial objectives. Finally, decisions of the Supreme Court extending certain constitutional protections to aliens in other contexts show that the compact theory has been severely limited in its scope.

### a. *The Historical Record*

As we have noted, there are historical sources that support the compact theory of the Constitution. These sources, however, reflect only part of the philosophical concerns reflected in the Constitution and the Bill of Rights. There are many historical records and commentaries explaining that Americans of the Revolutionary Era held a deeply-felt belief in the "natural rights" of man. Indeed, one need look no further than the Declaration of Independence, with its references to "the laws of nature" and "inalienable rights." *See Declaration of Independence* (1776), *reprinted in* 1 B. Schwartz, *The Bill of Rights: A Documentary History* 251–52 (1971).

Further historical evidence of the "natural rights" theory abounds. For example, the various states' declarations of rights that served as the forerunners of our Bill of Rights again and again emphasize that the government is to respect the individual's natural rights. Thus, the preamble to the Vermont Declaration of Rights explains that "all government ought to be instituted and supported, for the security and protection of the community, as such, and to enable the individuals who compose it, to enjoy their natural rights, and the other blessings which the Author of existence has bestowed upon man." *Vermont Declaration of Rights* (1777), *reprinted in* 1 B. Schwartz, *supra,* at 319. And in enumerating the rights enjoyed by the inhabitants of Vermont, we find

That the people have a right to hold themselves, their houses, papers and possessions free from search or seizure; and therefore warrants, without oaths or af-

firmations first made, affording a sufficient foundation for them, and whereby any officer or messenger may be commanded or required to search suspected places, or to seize any person or persons, his, her or their property, not particularly described, are contrary to that right, and ought not to be granted.

*Id.* c.1, art. XI, *reprinted in* 1 B. Schwartz, *supra*, at 323.

A number of other sources, from the nineteenth century to the present, support an interpretation of the Constitution that emphasizes an intent to prevent arbitrary encroachment by government on these "natural rights." *See, e.g.*, II J. Kent, *Commentaries on American Law* 1 (New York 1827) ("The absolute rights of individuals may be resolved into the right of personal security, the right of personal liberty, and the right to acquire and enjoy property. These rights have been justly considered, and frequently declared, by the people of this country, to be natural, inherent, and unalienable."). As Professor Schwartz also has explained:

The dominant conception when the Framers wrote was that stated in Blackstone: "By the absolute *rights* of individuals, we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it."

III B. Schwartz, *A Commentary on the Constitution of the United States: Rights of the Person (Volume 1)* 170 (1968) (emphasis in original; footnote omitted). *See generally* Grey, *Origins of the Unwritten Constitution: Fundamental Law in American Revolutionary Thought*, 30 Stan.L.Rev. 843 (1978); Henkin, *Rights: Here and There*, 81 Colum.L.Rev. 1582, 1584–90 (1981); Note, *supra*, 72 Va.L.Rev. at 650 n. 8 (collecting sources). Thus, while the Framers may have used the phrase "compact" to explain the political theory by which the federal government was created, history also teaches that the Founders believed the Constitution would protect their inalienable rights.

Justice Story in his *Commentaries on the Constitution of the United States* cast considerable doubt on the validity of the compact theory. For instance, Justice Story found it peculiar to think of the Constitution as a contract because constitutions "are not only not founded upon the assent of all the people within the territorial jurisdiction, but that assent is expressly excluded by ... [restricting] ratification ... to those, who are qualified voters." 1 J. Story, *Commentaries on the Constitution of the United States* § 327, at 296–97 (Boston 1833). Thus, the Constitution may not be treated as a contract because it purports to bind those who did not assent to it, were not permitted to assent to it and, as well, those born after its ratification. *Id.* § 328, at 297–98. Justice Story concluded that if the Constitution protects all "The People" of the United States, as it surely does, the protection it gives them cannot derive solely from a contract theory.

It would, indeed, be an extraordinary use of language to consider a declaration of rights in a constitution, and especially of rights, which it proclaims to be "unalienable and indefeasible," to be a matter of *contract*, and resting on such a basis, rather than a solemn recognition and admission of those rights, arising from the law of nature, and the gift of Providence, and incapable of being transferred or surrendered.

*Id.* § 340, at 309 (emphasis in original).

b. *"Compact" Theory in the Supreme Court*

Earlier in this opinion, we cited four Supreme Court cases which explained that the Constitution is a compact between the people and the federal government. These cases, however, provide scant guidance in deciding whether the fourth amendment permits Verdugo–Urquidez to challenge an unreasonable search of his Mexicali residence by the federal government. In three of these cases, the Court considered some aspect of the relationship between the states and the federal government. *E.g.*, *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793) (considering whether a state may be sued in the Supreme Court by

an individual citizen of another state); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) (holding that a state may not tax an instrumentality of the federal government properly created by Congress in pursuit of an enumerated power); *League v. De Young*, 52 U.S. (11 How.) 185, 13 L.Ed. 657 (1850) (holding that a statute passed pursuant to the Constitution of the Republic of Texas could not be challenged as unconstitutional because, until Texas joined the Union, it was a sovereign power not bound by the United States Constitution). Each case involved problems of federalism. The Supreme Court used the compact theory to explain that by ratifying the Constitution, the states surrendered some of their authority to the federal government. Thus, these cases cannot be considered authoritative on the question whether the Constitution applies to the extraterritorial acts of the federal government. Neither do they explain who may assert the protections of the fourth amendment.

Unlike the three cases previously mentioned, *In re Ross*, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581 (1891), was one of a different line of cases in which the Court considered the extraterritorial application of the Constitution. The Court held in *Ross* that because the Constitution applies only within the United States, the trial of an American citizen in an American consular court neither required indictment by a grand jury nor a jury trial. *See id.* at 464, 11 S.Ct. at 900. But, as we explained *supra* in subpart II(A)(1), the *Ross* case is no longer good law in light of *Reid v. Covert*, 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). *See Reid*, 354 U.S. at 5–6, 77 S.Ct. at 1224–25 (plurality opinion); *id.* at 56, 77 S.Ct. at 1251 (Frankfurter, J., concurring in the result). Moreover, the *Ross* decision actually supports Verdugo–Urquidez's argument that the fourth amendment applies to him.

> The guarantees [the Constitution] affords against accusation of capital or infamous crimes, except by indictment or presentment by grand jury, and for an impartial trial by a jury when thus accused, apply only to citizens and others within the United States, *or who are brought there for trial for alleged offenses committed elsewhere*, and not to residents or temporary sojourners abroad.

*Ross*, 140 U.S. at 464, 11 S.Ct. at 900 (emphasis added).

#### c. *Constitutional Protections for Aliens*

A number of cases have extended constitutional protections to *resident* aliens. *See, e.g., Yick Wo v. United States*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (extending fourteenth amendment to resident aliens because that amendment "is not confined to the protection of citizens"); *Bridges v. Wixon*, 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring) (emphasizing that among the protections enjoyed by resident aliens are first, fifth and fourteenth amendment rights); *Kwang Hai Chew v. Colding*, 344 U.S. 590, 596, 601, 73 S.Ct. 472, 477, 479, 97 L.Ed. 576 (1953) (holding that a resident alien is a "person" within the meaning of the fifth amendment). True enough, these cases may be explained by the compact theory. That is, by becoming a *resident*, an alien "is bound to obey all the laws of the country, not immediately relating to citizenship, during [his or her] sojourn in it." *Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 154, 21 L.Ed. 426 (1873); *see also Radich v. Hutchins*, 95 U.S. 210, 211, 24 L.Ed. 409 (1877) ("As a foreigner domiciled in the country, ... [the alien] owed allegiance to the government of the country so long as he resided within its limits."). By accepting the obligations of allegiance to the United States, the alien receives in exchange some measure of constitutional protection.

> The alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with our society. Mere lawful presence in the country creates an implied assurance of safe conduct and gives him certain rights; they become more exten-

sive and secure when he makes a preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization. *Johnson v. Eisentrager*, 339 U.S. 763, 770, 70 S.Ct. 936, 939, 94 L.Ed. 1255 (1950); *see also Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) (discussing *Johnson* with approval).

On the other hand, the Court has stated that an alien seeking admission to the United States enjoys no constitutional rights. *See, e.g., Landon*, 459 U.S. at 32, 103 S.Ct. at 329; *United States ex rel. Turner v. Williams*, 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904) ("[An alien] does not become one of the people to whom [first amendment rights] are secured by our Constitution by an attempt to enter forbidden by law.... [T]hose who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise."). Just as it does in the resident alien cases, the compact theory adequately explains these "aliens seeking admission" decisions. The compact analysis fails, however, upon an examination of those cases in which constitutional protections have been extended to illegal aliens who are within the United States.

The Supreme Court has extended significant constitutional protections to aliens within the United States, without distinguishing between those who are here legally or illegally, or between residents and visitors. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) ("The Fourteenth Amendment ... is not confined to the protection of citizens.... [Its] provisions are universal in their application, to all persons within the territorial jurisdiction [of the United States]."); *In re Ross*, 140 U.S. 453, 464, 11 S.Ct. 897, 900, 35 L.Ed. 581 (1891) (holding that although fifth and sixth amendments do not apply to trials conducted in consular courts, their guarantees apply to "citizens and others within the United States, or who are brought there for trial"); *Wong Wing v. United States*, 163 U.S. 228, 238, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896) (holding that "all persons within the territory of the United States are entitled to the protection guaranteed by [the fifth and sixth] amendments"); *United States ex rel. Turner v. Williams*, 194 U.S. 279, 291, 24 S.Ct. 719, 722, 48 L.Ed. 979 (1904) (observing that fifth and sixth amendments protect aliens once they are in this country); *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (explaining that all aliens within the jurisdiction of the United States enjoy the protections of the fifth and fourteenth amendments and may not be invidiously discriminated against by the federal government). In other cases, the Court has considered specifically the constitutional protections enjoyed by *illegal* aliens. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 211, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) (holding that under the Equal Protection Clause of the fourteenth amendment, states may not discriminate against illegal aliens by withholding free public education; rejecting argument that illegal aliens are not within the jurisdiction of the states or the federal government and therefore are not entitled to equal protection rights). From these cases, we learn that aliens within the United States enjoy the benefits of the first, fifth, sixth and fourteenth amendments. The question we consider today is whether an alien, Verdugo–Urquidez, can claim benefits under the fourth amendment.

One argument against the application of the fourth amendment to Verdugo–Urquidez is that the language of this amendment is different from the language of the amendments that already have been found to protect aliens. For example, the first amendment broadly proscribes certain governmental conduct, while the fifth, sixth and fourteenth amendments prohibit certain acts, or provide certain rights, with respect to "persons." In a number of cases, the Court has remarked of these amendments that their "provisions are universal in their application." *See, e.g., Yick Wo*, 118 U.S. at 369, 6 S.Ct. at 1070 (fourteenth amendment); *Wong Wing*, 163 U.S. at 238, 16 S.Ct. at 981 (fifth and sixth amendments). The fourth amendment, in

contrast, protects "the people" against unreasonable searches. It provides:

> The right of the people to be secure in their persons, houses, papers, and effects, and against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.

We do not read the phrase "The right of the people to be secure" as restricting the application of the fourth amendment to any special class of people. The language of the amendment does not so limit "people," and we will not insert qualifying language into the amendment to limit its application in such a fashion. In the present case, Verdugo–Urquidez, an alien in the custody of our government awaiting trial in our country, seeks to assert the protection of the fourth amendment. He is not in this country "illegally;" he's here because our government wants him here to face criminal charges. He is being prosecuted for alleged violations of Unites States laws in a United States court. We can discern no conceivable reason why he should be denied the protection of the fourth amendment in connection with this prosecution.

We find support for the proposition that *illegal* aliens have fourth amendment rights in statements which appear in *Immigration & Naturalization Service v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984). There, the Court held that deportation hearings are not criminal proceedings, *id.* at 1038, 104 S.Ct. at 3483, and they are not appropriate proceedings in which to apply the exclusionary rule. *Id.* at 1041–50, 104 S.Ct. at 3484–89. Significantly, in the final part of the *Lopez–Mendoza* decision, a plurality of the Court stated:

> We do not condone any violations of the Fourth Amendment that may have occurred in the arrests of respondents Lopez–Mendoza and Sandoval Sanchez.... Our conclusions concerning the exclusionary rule's value might

change, if there developed good reason to believe that Fourth Amendment violations by INS officers were widespread. *Id.* at 1050, 104 S.Ct. at 3489. And in their dissenting opinions, four other justices expressed the view that illegal aliens have fourth amendment rights. *See id.* at 1051, 104 S.Ct. at 3490 (Brennan, J.) ("In this case, federal law enforcement officers arrested respondents ... in violation of their Fourth Amendment rights."); *id.* at 1055, 104 S.Ct. at 3491 (White, J., joined in pertinent part by Stevens, J.) (opining that fourth amendment violations often go unchallenged by illegal aliens because "once the Government has improperly obtained illegal evidence against an illegal alien, he is removed from the country"); *id.* at 1060, 104 S.Ct. at 3494 (Marshall, J.) (acknowledging fourth amendment rights of illegal aliens). Indeed, in the *Lopez–Mendoza* case, the Solicitor General of the United States conceded that illegal aliens have fourth amendment rights:

> The determinative question, therefore, is not whether the protections of the Fourth Amendment extend to deportable aliens discovered in this country—*a proposition we do not contest*—but whether it is appropriate to permit illegal aliens to invoke the exclusionary rule in civil deportation proceedings in order to perpetuate their unlawful presence in the United States.

Brief for Petitioner at 10–11, *I.N.S. v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (emphasis added).

Given that in *Lopez–Mendoza* eight of nine Supreme Court justices, as well as the Solicitor General, took the position that illegal aliens possess fourth amendment rights, it is difficult to conclude that Verdugo–Urquidez lacks these same protections. The Court has told us that all aliens, "[e]ven one whose presence in this country is unlawful, *involuntary*, or *transitory*," enjoy fifth and fourteenth amendment rights, *see Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (emphasis added), as well as sixth amendment rights, *see Wong Wing*, 163

U.S. at 238, 16 S.Ct. at 981. Consequently, it seems absurd to grant the protection of the fourth amendment to one whose presence in the country is voluntary although illegal, and yet deny it to Verdugo–Urquidez, whose presence in the United States, although legal, is plainly involuntary. Verdugo–Urquidez was arrested by the United States government when he was delivered into its custody by the Mexican police, and then, with criminal charges pending against him in this country, the federal government searched his residence in Mexico solely to obtain evidence to be used against him in his criminal prosecution. It would be odd indeed to acknowledge that Verdugo–Urquidez is entitled to due process under the fifth amendment, and to a fair trial under the sixth amendment, both of which rights he is accorded under established constitutional jurisprudence, and deny him the protection from unreasonable searches and seizures afforded under the fourth amendment.[3]

We hold that Verdugo–Urquidez may challenge the government's search of his Mexicali residence under the fourth amendment. We now consider whether this search was a search by the federal government.

### 3. Determining When Government Acts Abroad

In *Stonehill v. United States*, 405 F.2d 738, 743 (9th Cir.1968), *cert. denied*, 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969), we observed that "[n]either the Fourth Amendment to the United States Constitution nor the exclusionary rule of evidence, designed to deter Federal officers from violating the Fourth Amendment, is applicable to the acts of foreign officials." *Id.* at 743. Because the fourth amendment does not itself require exclusion of unlawfully obtained evidence, and because excluding reliable evidence will not force foreign officers to abide by the norms of the fourth amendment, the exclusionary rule has no application to searches conducted solely by a foreign government. *Id.* We explained, however, that "the Fourth Amendment could apply to raids by foreign officials ... if Federal agents so substantially participated in the raids so as to convert them into joint ventures between

---

**3.** The dissent suggests that *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255 (1936), and *Johnson v. Eisentrager*, 339 U.S. 763, 70 S.Ct. 936, 94 L.Ed. 1255 (1950) should be considered in this analysis. *See* dissent at page 1240. We disagree.

The issues in *Curtiss–Wright* were whether Congress had improperly delegated its legislative powers to the president, whether a presidential proclamation had become effective, and if it had, whether persons charged with violations which occurred during the effective period of the proclamation could be prosecuted on an indictment brought *after* the president revoked the proclamation. *Curtiss–Wright* had nothing to do with the question whether the Constitution applies to aliens.

*Johnson* involved petitions for writs of habeas corpus filed in the United States District Court for the District of Columbia by enemy aliens imprisoned in Germany following their convictions in China by a military commission. The aliens were German nationals who had continued to engage in military activities against the United States, in China, after Germany's unconditional surrender but while the war against Japan continued. In rejecting the enemy aliens' petition for habeas corpus, the Court stated: "We hold that the Constitution does not confer a right of personal security or an immunity from military trial and punishment upon an alien

enemy engaged in the hostile service of a government at war with the United States." *Johnson*, 339 U.S. at 785, 70 S.Ct. at 947. The Court also distinguished cases in which constitutional protections had been extended to persons other than American citizens who were in the United States:

> But, in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act. In the pioneer case of *Yick Wo v. Hopkins,* the Court said of the Fourteenth Amendment, "These provisions are universal in their application, *to all persons within the territorial jurisdiction,* without regard to any differences of race, of color, or of nationality; ...." 118 U.S. 356, 369 [6 S.Ct. 1064, 1070]. And in *The Japanese Immigrant Case,* the Court held its processes available to "an alien, who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population, although alleged to be illegally here." 189 U.S. 86, 101 [23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903)].

*Johnson v. Eisentrager,* 339 U.S. at 771, 70 S.Ct. at 940 (emphasis supplied by the Court in *Johnson*).

the United States and foreign officials."
*Id.*[4]

Since our decision in *Stonehill*, other circuit courts of appeals have addressed the "joint venture" doctrine, although not all circuits have phrased the analysis in the way we have. *See, e.g., United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir.), *modified*, 801 F.2d 378 (1986), *cert. denied*, 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Paternina-Vergara*, 749 F.2d 993, 998 (2d Cir.1984), *cert. denied*, 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Hawkins*, 661 F.2d 436, 455–56 (5th Cir. Unit B Nov. 1981); *United States v. Heller*, 625 F.2d 594 599–600 (5th Cir.1980); *United States v. Marzano*, 537 F.2d 257, 269–71 (7th Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 734, 50 L.Ed.2d 749 (1977). The "joint venture" analysis also has been applied repeatedly by this court. *See, e.g., United States v. Peterson*, 812 F.2d 486, 490 (9th Cir.1987); *United States v. Benedict*, 647 F.2d 928, 930–31 (9th Cir.), *cert. denied*, 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981); *United States v. Maher*, 645 F.2d 780, 782–83 (9th Cir.1981); *United States v. Rose*, 570 F.2d 1358, 1361–62 (9th Cir.1978). Notwithstanding the extensive discussion of the doctrine in the courts, however, it remains as true now as it was in 1976 when the Fifth Circuit observed:

> The few courts that have considered the question of how much American participation in a foreign search and seizure is required to mandate application of the exclusionary rule have not been unanimous in their choice of the precise test to be applied—though they have as a statis-

tical matter been virtually unanimous in rejecting claims of undue participation. *United States v. Morrow*, 537 F.2d 120, 140 (5th Cir.1976). Nevertheless, when we consider the facts of this case against the backdrop of prior cases, it is abundantly clear that the DEA's involvement in this search was so great that no court could logically conclude anything other than that the search was an American operation from start to finish.

#### a. The Mexicali Search

Based on DEA Agent Terry Bowen's own investigation and surveillance in Mexico, and relying on reports by other DEA agents or confidential informants, Agent Bowen concluded that Verdugo–Urquidez's Mexicali house was his principal residence in Mexico. Agent Bowen also concluded from reports of confidential informants that Verdugo–Urquidez owned another house in San Felipe, Baja California, Mexico. Agent Bowen believed that a search of these houses would disclose cash proceeds of Verdugo–Urquidez's alleged narcotics transactions, as well as relevant documentary evidence, including drug ledgers and address books identifying Verdugo–Urquidez's associates. Agent Bowen also hoped that the searches would disclose information pertaining to the Camarena murder investigation. The district court found that Agent Bowen's "express objective in conducting the ... searches was to obtain evidence for use against Verdugo in the pending United States prosecution." [CR 384, at 2–3]. The court also found that while Agent Bowen had participated in other searches in Mexico, in almost none of those cases had seized evidence subsequently been introduced against a defend-

---

4. There is an independent corollary to the rule that the Constitution and the exclusionary rule do not apply to searches conducted by foreign police in their own country. In "a case where federal officials ... induce[ ] foreign police to engage in conduct that shock[s] the conscience," the district court may in the exercise of its supervisory power exclude the evidence. *United States v. Maher*, 645 F.2d 780, 783 (9th Cir.1981) (*quoting United States v. Birdsell*, 346 F.2d 775, 782 n. 10 (5th Cir.), *cert. denied*, 382 U.S. 963, 86 S.Ct. 449, 15 L.Ed.2d 366 (1965)). Verdugo–Urquidez does not raise this ground to support

suppression of the challenged evidence. Accordingly, we do not examine cases such as *United States v. Toscanino*, 500 F.2d 267 (2d Cir.1974), which purported to use the "joint venture" analysis to exclude evidence, but which a later panel of the Second Circuit tells us is best understood as a case involving the suppression of evidence obtained by the federal government in conjunction with the brutal torture of a foreign national by foreign police. *See United States ex rel. Lujan v. Gengler*, 510 F.2d 62, 65–66 (2d Cir.), *cert. denied*, 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975).

ant in a criminal trial. "Despite his inexperience with the use of such foreign seized evidence in a United States prosecution, Bowen did not discuss the searches with anyone prior to making his decisions. Bowen alone made the decision to conduct the searches." [CR 384, at 3].

On January 24, 1986, Agent Bowen telephoned Walter White, the Assistant Special Agent in charge of DEA operations in Mexico. Agent Bowen and Special Agent White discussed the arrest of Verdugo–Urquidez and Agent Bowen's interest in searching the Mexicali and San Felipe residences. Agent Bowen asked Special Agent White to contact Florentino Ventura, the Director General of the Mexican Federal Judicial Police (MFJP), and ask him to authorize the search and instruct the local MFJP commandante to cooperate with the DEA. Special Agent White did not ask Agent Bowen whether the approval of the Justice Department had been sought or obtained, although he agreed to contact Director Ventura.

After their conversation, Special Agent White unsuccessfully attempted to reach Ortega Padilla, the Second Deputy Attorney General for the Republic of Mexico, and Director Ventura. The next morning, Special Agent White reached Director Ventura and explained to him that DEA agents in Calexico believed Verdugo–Urquidez's Mexican residences contained evidence relevant to a pending criminal prosecution and wanted permission to search. Director Ventura agreed to authorize the search. He told Special Agent White that Agent Bowen should inform the local MFJP commandante in Mexicali that permission for the searches had been received and that the MFJP officers were to cooperate.

At approximately 1:00 p.m. on January 25, 1986, Special Agent White called Agent Bowen and gave him the go-ahead for the search. Agent Bowen already had assembled a team of three other DEA officers, all of whom knew that Verdugo–Urquidez had been arrested and that he also was a suspect in the Camarena case. Agent Bowen instructed his officers that they were to seize any documentary evidence relevant to Verdugo–Urquidez's alleged narcotics activities. After receiving Special Agent White's phone call, the four DEA officers drove to the MFJP office in Mexicali, Mexico. Agent Bowen then met with the local MFJP commandante, Enrique Salazar–Ramos, and informed him of Verdugo–Urquidez's arrest and that Director Ventura had authorized the searches "and stated that the local MFJP officers were to assist the DEA agents in conducting the searches." [CR 384, at 5]. Commandante Salazar verified Agent Bowen's statements by placing a phone call, apparently to one of the commandante's superior officers. After assuring the DEA agents that "everything was fine," Commandante Salazar said that he wanted to check with the "delegado," the official representative of the Mexican Attorney General in Mexicali. Shortly thereafter, the commandante returned and agreed to help in the search. Before leaving the MFJP office, Commandante Salazar told the DEA agents that they would be permitted to take back to the United States any documentary items they found.

With a team of between ten and fifteen MFJP officers, the DEA agents and Commandante Salazar drove to the Mexicali residence, arriving there after dark. Commandante Salazar stationed some of his officers around the perimeter of the house and, while the DEA agents waited in the street, an entry team composed entirely of MFJP officers entered the house. While the MFJP officers conducted a security sweep, the DEA agents entered the house but they did not search the house at this time.

Because it was already late and because San Felipe was two hours away, Commandante Salazar and Agent Bowen decided to drive there and search the San Felipe house first. The commandante left behind a force of four or five officers who were instructed to secure the Mexicali residence, but who were told not to search it until he and the DEA agents returned. The DEA and the remaining MFJP officers then drove to San Felipe, where they searched Verdugo–Urquidez's San Felipe residence. The district court found that most of the MFJP officers stood a perimeter watch

while the DEA agents searched the house over a two-hour period. The court found that "the DEA agents actively participated in the search itself, both in terms of actually looking for relevant documentary items and identifying as relevant those documentary items discovered by MFJP officers." [CR 384, at 7]. During this search, the items were segregated depending upon which agency seized them. At the conclusion of the search, which occurred some time before midnight, seized items were turned over to the DEA agents. The MFJP officers seized several weapons, as well as a 1984 Grand Marquis and some other motor vehicles. Neither the MFJP nor the DEA left a receipt or inventory identifying the seized items.

The commandante and the DEA then returned to the Mexicali residence, arriving about two hours after leaving San Felipe. The district court found that Commandante Salazar, at least two or three MFJP officers, and three of the four DEA agents conducted a room-by-room search of the Mexicali house. The DEA agents seized evidence thought relevant, while the MFJP officers brought documents they found to Agent Bowen, who decided whether the DEA wanted them. Again, the seized items were segregated based on which agency found them, although all the seized documents were placed in the DEA agents' car. And, as in the San Felipe search, the MFJP kept all weapons they found.

At around 3:00 or 4:00 a.m., Commandante Salazar grew tired of the search, which at that time was being conducted by Agent Bowen, who was sorting through several files found in a cabinet kept in the back portion of the house. The commandante placed all the remaining documents in a briefcase and handed the briefcase to Agent Bowen. Commandante Salazar told Agent Bowen to take all the documents and sort through them later because it was late and he wanted the search to end. Agent Bowen placed the briefcase in the DEA's car, and the MFJP and DEA agents left the Mexicali house. The DEA agents then returned to the United States with the seized documents. Once back in the United States, the DEA agents prepared inventories and written reports identifying the seized documents. Of the seized evidence, the government sought only to introduce a tally sheet found during the search of the Mexicali residence. The tally sheet purportedly reflects the quantities of marijuana smuggled by Verdugo–Urquidez into the United States.

#### b. *Analysis of Mexicali Search*

Based on the facts found by the district court, which the government does not contend are clearly erroneous, we conclude the searches of the Mexicali and San Felipe residences were American searches to which the fourth amendment applies. Indeed, given the high degree of American involvement in the searches and the low degree of Mexican interest in Verdugo–Urquidez, we do not even find the question a close one.

This is not a case in which United States agents merely supplied a tip to a foreign law enforcement agency, which then conducted an investigation and made a search or arrest leading to an American prosecution. *See, e.g., United States v. Hawkins,* 661 F.2d 436, 455–56 (5th Cir. Unit B Nov. 1981); *United States v. Heller,* 625 F.2d 594, 600 (5th Cir.1980). Neither is this a case in which a foreign government invited American agents to observe an arrest or a search of interest to both countries. *See, e.g., United States v. Rosenthal,* 793 F.2d 1214, 1231 (11th Cir.), *modified,* 801 F.2d 378 (1986), *cert. denied,* 480 U.S. 919, 107 S.Ct. 1377, 94 L.Ed.2d 692 (1987); *United States v. Benedict,* 647 F.2d 928, 930–31 (9th Cir.), *cert. denied,* 454 U.S. 1087, 102 S.Ct. 648, 70 L.Ed.2d 624 (1981). This also is not a case illustrating legitimate international law enforcement cooperation in which American or foreign law enforcement officials contacted their counterparts in other countries to plan a joint operation in which the American involvement is minimal. *See, e.g., United States v. Maher,* 645 F.2d 780, 783 (9th Cir.1981); *United States v. Morrow,* 537 F.2d 120, 139–40 (5th Cir.1976). Finally, this is not a case in which we must decide whether American law enforcement officials induced their for-

eign counterparts to conduct a search in order for the American agents to circumvent the fourth amendment. *See, e.g., United States v. Paternina–Vergara,* 749 F.2d 993, 998 (2d Cir.1984), *cert. denied,* 469 U.S. 1217, 105 S.Ct. 1197, 84 L.Ed.2d 342 (1985); *United States v. Hawkins,* 661 F.2d 436, 456 (5th Cir. Unit B Nov. 1981).

The present case is similar to two other cases in which a "joint venture" has been found. In *United States v. Emery,* 591 F.2d 1266 (9th Cir.1978), a "joint venture" was found because the DEA tipped the Mexican authorities to a possible smuggling transaction to take place in Mexico. The DEA, however, also planted an undercover operative with the suspected narcotics trafficker. Moreover, the DEA coordinated the surveillance of the suspected site of the transaction, and gave the prearranged signal for the Mexican police to move in and make the arrest. *Id.* at 1267. Similarly, in *United States v. Peterson,* 812 F.2d 486 (9th Cir.1987), a "joint venture" between the DEA and Phillipine authorities was found because the DEA's role was not subordinate to that of the Phillipine police. *Id.* at 490.

The present case falls within the scope of this "joint venture" doctrine. Indeed, many of the facts in this case are precisely those found to be lacking in our seminal *Stonehill* decision, which explained the doctrine we are now applying. Here, it was the American authorities who planned and instigated the searches to secure evidence to be used in an American trial; there was no existing Mexican investigation of Verdugo–Urquidez then under way. *But see Stonehill v. United States,* 405 F.2d 738, 646 (9th Cir.1968); *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969). Second, the activities of the DEA took place before, during and after the search. *But see id.* Third, before the search began the MFJP informed the DEA that they could keep all evidence seized during the search. *But see id.* Fourth, it was the DEA who took the initiative in ensuring the search took place soon after Verdugo–Urquidez's arrest. *But see id.* Finally, when the DEA contacted the MFJP about the search, they were not only seeking assistance from the Mexican police, they were asking for permission to run their own operation. It was Agent Bowen who specified which documents were the objects of the search. The MFJP officers brought the documents they found to Agent Bowen for him to evaluate their relevance to his objectives. All the seized documents were kept by the DEA. Indeed, the MFJP's interest in the search was so minimal that when the commandante grew tired, he simply placed all unsorted documents into a single briefcase and gave the briefcase to Agent Bowen. In short, it is clear that the DEA controlled the operation.

### 4. *Fourth Amendment Requirements*

■ Having determined that the fourth amendment applies to the DEA's search of the Mexicali residence, we must answer the question: "What does the fourth amendment require in this case?" The government invites us to hold that the DEA agents relied in good faith on the assurances of Mexican government officials that the search was permissible under Mexican law, and, therefore, under *United States v. Peterson,* 812 F.2d 486 (9th Cir.1987), the evidence obtained in the search should not be suppressed. We decline to do so.

In *Peterson,* DEA agents participated in a joint operation to tap a telephone at the defendant's apartment in the Philippines. Information obtained from the wiretap permitted the Coast Guard to locate a ship loaded with marijuana. The Coast Guard stopped the ship on the high seas, boarded it, searched it and seized the marijuana. We stated:

Assuming that this was a stop and a search for criminal violations at the outset, and that fourth amendment protections are fully applicable, a point that is far from settled, there was probable cause to search and seize the vessel, its cargo, and its crew. Searches of vessels on the high seas in such circumstances may be warrantless, as the location of the vessels and the practical difficulties of obtaining a warrant while at sea present exigent circumstances under well-accepted principles. We find, there-

fore, no constitutional or other invalidity in the stop, the board, the search, or the seizure of the evidence in this case. *Id.* at 494 (internal citations omitted).

The warrantless search of the vessel in *Peterson* was permissible due to exigent circumstances inherent in a high seas search. *See id.* We assumed that the earlier telephone tap in the Philippines violated Philippine law "and was, as a result, not reasonable under the fourth amendment." *Id.* at 491. We determined, however, that the DEA officers could rely in good faith on the assurances given them by Philippine officials that the telephone tap was legal under Philippine law. This good faith reliance removed the taint from the violation of Philippine law so that the search of the vessel, valid in its own right, was not rendered illegal under the fourth amendment. *See id.* at 492.

In the present case, the parties dispute whether the search violated Mexican law. We do not decide this question. Nor do we assume that Mexican law was or was not violated, or what effect a violation of Mexican law would have on the question of the validity of the search under the fourth amendment. What we do decide is the question we are presented: Did the search of Verdugo–Urquidez's Mexicali residence violate the fourth amendment? If it did, whether it also may have violated Mexican law is irrelevant.

The fourth amendment does not prohibit all searches, only unreasonable searches. Two requirements typically follow from this proposition. First, "searches and seizures must be supported by probable cause" to be valid. *See United States v. Winsor*, 846 F.2d 1569, 1575 (9th Cir.1988) (en banc). Second, as the Supreme Court repeatedly has emphasized, "a cardinal principle [of the fourth amendment is] that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable.'" *Mincey v. Arizona*, 437 U.S. 385, 390, 98 S.Ct. 2408, 2412, 57 L.Ed.2d 290 (1978) (quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967)). Thus, in most cases, a search is *per se* unreasonable if the police do not obtain a *warrant,* which a magistrate or judge finds to be supported by *probable cause.*

In the context of the fourth amendment, the Court has carved out "a few specifically established and well-delineated exceptions" to the warrant requirement. *Mincey*, 437 U.S. at 390, 98 S.Ct. at 2412 (quoting *Katz*, 389 U.S. at 357, 88 S.Ct. at 514). In other cases, the Court has carved out exceptions to the "probable cause" requirement. *See United States v. Winsor*, 846 F.2d at 1576–77 (collecting and discussing cases). In the present case, the DEA searched Verdugo–Urquidez's residence. "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Steagald v. United States*, 451 U.S. 204, 212, 101 S.Ct. 1642, 1647, 68 L.Ed.2d 38 (1981) (internal quotation marks and citations omitted). Exigent circumstances were not present in this case. We must decide, therefore, whether the DEA should have obtained a warrant before conducting the search.

The warrant requirement serves to interpose a "neutral and detached · magistrate" between the public and the police officer, who is "engaged in the often competitive enterprise of ferreting out crime." *Coolidge v. New Hampshire*, 403 U.S. 443, 449, 91 S.Ct. 2022, 2029, 29 L.Ed.2d 564 (1971) (quoting *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948)). The magistrate's independent evaluation of whether law enforcement officials have probable cause to search assures that constitutional freedoms are not infringed by zealous law enforcement efforts. *See, e.g., id.* at 450, 91 S.Ct. at 2029 ("[T]he whole point of the basic rule ... is that prosecutors and policemen simply cannot be asked to maintain the requisite neutrality with regard to their own investigations."); *see also Steagald*, 451 U.S. at 213, 101 S.Ct. at 1648. In the present case, however, a warrant issued by an American magistrate would be a dead letter in Mexico. As the district court itself recognized,

1230

"a United States warrant, in itself, cannot give United States officers the authority to enter a foreign residence and conduct a search." [CR 384, at 16]. International law enforcement is a cooperative venture and it would be an affront to a foreign country's sovereignty if the DEA presented an American warrant and suggested that it gave the American agents all the authority they needed to search a foreign residence.

Notwithstanding this geographic limitation, we cannot relieve the government from its obligation to obtain a search warrant simply because the place to be searched by the government is outside this country. To do so would be to treat foreign searches differently from domestic searches just because they are foreign. If the constitutional protection of the fourth amendment applies to our government's search of the Mexicali residence, as we have held it does, there is no justification to amputate from the body of that protection the appendage that requires a detached magistrate's advance determination of probable cause and the issuance of a warrant. If the residence were located in the United States, we would conclude that the evidence sought to be introduced in this case would have to be suppressed because the government did not obtain a warrant and no exigent circumstances existed. We can discern no logical reason to formulate a different rule just because the residence to be searched happens to be in Mexico. True, an American search warrant would be of no legal validity in Mexico, but it would have substantial constitutional value in this country. And it is in this country that Verdugo–Urquidez is being prosecuted for alleged violations of United States law. A warrant issued by a detached magistrate here would reflect the magistrate's determination that probable cause to search existed. It also would define the scope of the search. These constitutional protections are afforded by the warrant requirement; they are not affected by whether or not a foreign government would give legal effect to the warrant.

We conclude that the protection of the fourth amendment extends to the government's search of the Mexicali residence.

Since the DEA obtained no warrant to make that search, and because exigent circumstances were lacking, the search was unlawful under the fourth amendment. Accordingly, the evidence obtained in that search was properly suppressed.

AFFIRMED.

WALLACE, Circuit Judge, dissenting:

In holding that the fourth amendment applies to a foreign search of a foreign national's residence, the majority fails to mention, much less attempt to explain, the Supreme Court's seemingly unequivocal pronouncement that "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens." *United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 318, 57 S.Ct. 216, 220, 81 L.Ed. 255 (1936) (*Curtiss–Wright*).

Verdugo is not an American citizen. He does not reside in the United States. The search in this case occurred in a foreign country. Yet, the majority concludes that Verdugo, a Mexican citizen residing in Mexico, is entitled to invoke the fourth amendment to suppress evidence obtained in a search that occurred on Mexican soil. That a nonresident alien has any reasonable expectation of privacy in his foreign country with respect to our government is so startling a proposition to me that, even if the Supreme Court had not written *Curtiss–Wright*, it would be difficult for me to accept such an illogical proposition in the absence of compelling precedent or sound reasoning. The majority, however, provides us with neither.

The reasoning by which the majority reaches this result is severely flawed. From one line of Supreme Court cases establishing that American *citizens* have constitutional rights abroad and another line holding that aliens in the United States are entitled to constitutional safeguards against certain actions taken by our officials *in this country*, the majority, without explanation, arrives at the conclusion that a *foreign national* residing in a *foreign country* is entitled to fourth amendment

rights against actions taken by our officials *on foreign soil.* The majority's leap in logic is not just a *non sequitur;* it also ignores the self-imposed limitations on the geographic reach of the Constitution—limitations that have been endorsed by the Supreme Court.

## I

Because there is no direct Supreme Court precedent, I agree with the majority that we must inform our judgment by the language of the Constitution, its history, and by Supreme Court cases dealing with the constitutional rights of aliens in analogous contexts. But upon examining the text and history of the Constitution and applying the guiding principles that I have deduced from the Supreme Court precedents, I am convinced that the fourth amendment does not apply to a search in Mexico of property belonging to a Mexican citizen whose permanent residence is in Mexico.

## A.

My inquiry begins with the language of the Constitution itself. By ratifying the Constitution, the people of the United States created a limited national government. The government was to possess only those powers that the people chose to confer upon it. This notion of governmental power derived from the people is evident in the Preamble to the Constitution: "We The People Of The United States ... do ordain and establish this Constitution for the United States of America." While many believed that this limited grant of power to the national government carried with it the implied reservation of certain fundamental rights of the individual, others demanded a Bill of Rights that would expressly forbid to the federal government the power to encroach upon these rights.

Among these basic rights is the right to be free from unreasonable searches and seizures by the government. To this end, the fourth amendment provides that:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

By its express terms, the rights set forth in this amendment are secured to "the people." Who "the people" are must be found by reading the amendment in the context of the entire document. In doing so, it appears that "the people" referred to in the amendment are "The People" in the Preamble who endowed the federal government with certain limited, enumerated powers. Only an unduly strained reading of the fourth amendment's "the people" could lead to any other conclusion. Because "The People" in the fourth amendment are only "The People of the United States," it follows that the fourth amendment extends its protective blanket to Verdugo only if he may properly be considered one of *the people of the United States.*

## B.

My conclusion that the fourth amendment protects only the people of the United States is supported by an examination of our constitutional history, which indicates that the Constitution was conceived as a "compact" or "social contract" among the people of the United States. In our pre-constitutional era, the "compact" or "social contract" concept of government pervaded American political philosophy, both in theory and in practice. For example, in 1620 the Pilgrims entered into the Mayflower Compact, in which they proclaimed that "[w]e ... solemnly and mutually ... covenant and combine ourselves together into a civil Body Politick, for our better Ordering and Preservation." Mayflower Compact, November 11, 1620, *reprinted in Sources of Our Liberties: Documentary Origins of Individual Liberties in the United States Constitution and Bill of Rights* 60 (R. Perry ed. 1959) (hereinafter *"Sources of Our Liberties"*). Less than a score of years later, in 1639, the residents of Connecticut formally established by mutual agreement a government by ratifying the

Fundamental Orders of Connecticut. *Sources of Our Liberties* at 115; A. Kelly & W. Harbison, *The American Constitution: Its Origins and Development* 94 (3d ed. 1963) (hereinafter A. Kelly & W. Harbison).

Prevalent during the period leading to the American Revolution was the recurrent notion that a government was created by a compact among those governed and that the government could not infringe certain rights of those empowering it. John Locke, one of the most influential political philosophers of the time, conceived of government as a social compact in which formerly free individuals voluntarily united to establish communities. In order to protect what he considered to be a person's most essential liberties, Locke believed it was necessary that each person surrender some part of his or her natural independence. *See* J. Kettner, *The Development of American Citizenship, 1608–1870* 44 (1978). Of particular relevance to the revolutionary sentiment that was mounting at the time was Locke's vision of revolution as an act that undid all existing political compacts, thereby leaving the people free to enter willingly into a new political compact. A. Kelly & W. Harbison at 94.

Angered by the treatment of the American Colonies by England, in 1774 the Continental Congress petitioned the Crown for redress of grievances. In its Declaration and Resolves, the Continental Congress proclaimed its belief that the colonists were entitled to basic civil liberties by virtue of natural law, English constitutional principles, and their "several charters or compacts." Continental Congress, Declaration and Resolves, October 14, 1774, *reprinted in The Founders' Constitution* 2 (P. Kurland & R. Lerner ed. 1987). As Alexander Hamilton stated:

> [T]he origin of all civil government, justly established, must be a voluntary compact between the rulers and the ruled, and must be liable to such limitations as are necessary for the security of the absolute rights of the latter.

A. Hamilton, *The Farmer Refuted,* Feb. 23, 1775, in *The Founders' Constitution* at 91. When the leaders of the American colonies finally proclaimed their separation from English sovereignty in the Declaration of Independence, they declared that in order to secure certain inalienable rights, "governments are instituted among men, deriving their just powers from the consent of the governed." Declaration of Independence, July 4, 1776, in *Sources of Our Liberties* at 319.

After the American Revolution, the American people continued to envisage government as a voluntary compact between the people of each sovereign state. For example, in the Preamble to the Massachusetts Constitution of 1780, the people of that state expressly proclaimed their new government to be a compact among those governed:

> The body politic is formed by a voluntary association of individuals: it is a social compact, by which the whole people covenants with each citizen, and each citizen with the whole people, that all shall be governed by certain laws for the common good.

Constitution of Massachusetts, October 29, 1780, in *Sources of Our Liberties* at 373.

Examining the Constitutional Convention against this background, it is not surprising that when the Framers set about the task of drafting the Constitution of the United States, they conceived of it as a "compact" or "social contract." *See* A. Kelly & W. Harbison at 165. Moreover, implicit in their understanding that the Constitution would be a compact was the realization that correlative rights and obligations would govern relations between the people and their newly-created national government. In return for certain guarantees restricting the scope of government, the people of the states ceded to a central authority limited powers of government. On this point, the cover letter transmitting the Constitution and signed by George Washington is telling:

> It is obviously impracticable in the federal government of these states, to secure to all rights of independent sovereignty to each, and yet provide for the interest and safety of all: Individuals entering

into society must give up a share of liberty to preserve the rest. ... [T]he Constitution, which we now present, is the result of a spirit of amity, and of that mutual deference and concession, which the peculiarity of our political situation rendered indispensable.

*Sources of Our Liberties* at 418. Hence, it appears that the Framers understood that the social compact embodied in the Constitution necessarily required that the people give up some degree of liberty in order for them to secure others in return.

Because the social compact theory of the Constitution contemplates that each individual will give up a share of liberty to preserve the rest, I believe that the majority errs in suggesting that the compact theory is undermined by the presence of the theory which emphasizes the "natural rights" of men. Maj. op. at 13–15. Viewing the compact and natural rights paradigms as mutually exclusive misperceives the interrelationship between these two. As can be seen from the majority's historical citations, the natural rights theory was usually espoused in documents declaring independence or rights. Taken in context, there is no conflict. While the Framers may have understood the liberties enumerated in the Bill of Rights to reflect man's "natural rights," they also recognized that the Constitution embodies a compact among the People of the United States to sacrifice some modicum of these "natural rights" in order to create a central government capable of preserving the rest. *See Sources of Our Liberties* at 418. Thus, rather than coexisting in tension with the compact theory, the "natural rights" theory fits comfortably into its central tenet.

### C.

A number of fundamental axioms can be deduced from the Constitution's regime of reciprocal rights and obligations. Chief among these is that one can make no claim of entitlement to rights without also assuming corresponding obligations. No one can seriously doubt that the compact applies only to the people who empowered the government of the United States for the benefit of themselves and their posterity, not to other peoples of the world who neither ceded authority to it in exchange for certain guarantees of liberty nor otherwise consented to its rule.

These axioms find support in an unbroken line of Supreme Court cases reflecting the understanding of the Constitution as a compact between the people of the United States and its government. In *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L.Ed. 440 (1793), Chief Justice Jay observed that every state constitution "is a compact ... and the Constitution of the United States is likewise a compact made by the people of the United States to govern themselves." *Id.* at 471. Similarly, in *McCulloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819), Chief Justice Marshall proclaimed that "[t]he government of the Union ... is, emphatically and truly, a government of the *people.* ... [i]t emanates from them. Its powers are granted by them, and are to be exercised directly on them, and *for their benefit.*" (Emphasis added.) In *League v. De Young,* 52 U.S. (11 How.) 184, 203, 13 L.Ed. 657 (1850), the Supreme Court recognized that "[t]he Constitution of the United States was made by, and for *the protection of, the people of the United States.*" (Emphasis added.) While the majority is correct in observing that these cases dealt with issues of federalism, rather than the extraterritorial reach of the Constitution, it is nonetheless true that in these cases the Supreme Court placed its imprimatur on the general notion that the Constitution is a compact made by The People of the United States for their own benefit and protection.

In later cases, the Court reasoned that because the government was "ordained and established for the United States of America, and not for countries outside of [its] limits, ... [t]he Constitution can have no operation in another country." *In re Ross,* 140 U.S. 453, 464, 11 S.Ct. 897, 900, 35 L.Ed. 581 (1891). Applying this rule, the Court rejected the claim that an American citizen being tried abroad in a consular court was entitled to the Constitution's grand jury and petit jury guarantees. Ac-

cording to this restrictive view of the Constitution's reach, not even American citizens could invoke its guarantees outside the territorial limits of the union. *See also Downes v. Bidwell*, 182 U.S. 244, 270–71, 21 S.Ct. 770, 780, 45 L.Ed. 1088 (1901) (the Constitution does not apply to foreign countries or to trials conducted therein).

The majority's insistence that *Ross* actually supports Verdugo's position evinces its failure to understand a critical distinction regarding the geographic limits of an alien's constitutional rights. *Ross* does not answer whether Verdugo was entitled to suppress on fourth amendment grounds the evidence seized from his Mexicali residence. As I will explain later in part II.B., just because a foreign national may be entitled to fifth and sixth amendment rights during the charging and trial process does not shed light on whether he is endowed with *extraterritorial* fourth amendment rights. Indeed, both reason and precedent justify extending fifth and sixth amendment trial-related rights to a nonresident alien while, at the same time, denying such an alien *extraterritorial* fourth amendment rights.

The foregoing cases reflect an understanding of the Constitution as a blanket of protections covering only the "people" who endowed their government with its powers and who remain physically present within the borders of the nation. Since these early decisions, however, both the Supreme Court and the circuit courts have expanded the territorial reach of the Constitution, including the protections of the Bill of Rights, to *Americans* abroad. *Reid v. Covert*, 354 U.S. 1, 5–14, 77 S.Ct. 1222, 1224–29, 1 L.Ed.2d 1148 (1957) (*Reid*); *see also United States v. Emery*, 591 F.2d 1266, 1267–68 (9th Cir.1978) (*Miranda* rights); *United States v. Rose*, 570 F.2d 1358, 1362 (9th Cir.1978) (fourth amendment); *United States v. Conroy*, 589 F.2d 1258, 1264 (5th Cir.) (fourth amendment), *cert. denied*, 444 U.S. 831, 100 S.Ct. 60, 62 L.Ed.2d 40 (1979). *Reid* rested upon the view that "[w]hen the government reaches out to punish a *citizen* who is abroad, the shield which the Bill of Rights ... provide[s] to protect his life and property

should not be stripped away just because he happens to be in another land." *Reid*, 354 U.S. at 6, 77 S.Ct. at 1225 (emphasis added). In addition, recent cases reveal that certain aliens within our borders can also be considered "people of the United States." *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596, 601, 73 S.Ct. 472, 479, 97 L.Ed. 576 (1953) (*Kwong Hai Chew*) (holding that a *resident* alien is a "person" within the meaning and protection of the fifth amendment). Both resident and illegal aliens are entitled to a wide range of constitutional protections *while in this country*. *See, e.g., Plyler v. Doe*, 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) (illegal aliens may claim equal protection rights because these pertain to "any person within [a state's] jurisdiction"); *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Au Yi Lau v. INS*, 445 F.2d 217, 223 (D.C.Cir.) (aliens in this country are sheltered by the fourth amendment), *cert. denied*, 404 U.S. 864, 92 S.Ct. 64, 30 L.Ed. 2d 108 (1971); *Wong Wing v. United States*, 163 U.S. 228, 237–38, 16 S.Ct. 977, 980–81, 41 L.Ed. 140 (1896) (*Wong Wing*) (aliens may invoke fifth and sixth amendments); *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220 (1886) (fourth amendment is not confined to the protection of citizens).

These cases reveal that "the people of the United States" include American citizens at home and abroad and aliens within our country's borders who are victims of actions taken *in the United States* by American officials. The Supreme Court, however, has never held that the Bill of Rights protects foreign nationals residing abroad from *actions taken abroad* by our officials. Hence, the majority paints with too broad a brush when it deduces that "[t]he Constitution imposes substantive constraints on the federal government, even when it operates abroad." Maj. op. at 1218. This sweeping statement pretermits the crucial caveat that the extraterritorial effect of the Constitution has never been extended by the Supreme Court to persons other than American *citizens*. Predictably,

the majority fails to cite a single Supreme Court case suggesting that the Constitution limits government action against *foreign nationals* in territory under foreign dominion. Neither *Reid* nor *Balzac v. Puerto Rico,* 258 U.S. 298, 312–13, 42 S.Ct. 343, 348, 66 L.Ed. 627 (1922) (*Balzac*), the two cases relied upon by the majority, support such a strained reading of the Constitution's extraterritorial scope. *Reid* speaks only of the extraterritorial rights of American *citizens. See* 354 U.S. at 6, 77 S.Ct. at 1225. *Balzac,* contrary to the majority's assertion, does not adopt "a more expansive vision" of the Constitution's extraterritorial force. In that case, the Supreme Court simply recognized the elementary proposition that in territories where the United States is sovereign, the Constitution is in force. *See Balzac,* 258 U.S. at 312–13, 42 S.Ct. at 348. How *Balzac* is relevant to the instant case thus escapes me. The complained of search in this case did not occur in a territory under the sovereign power of the United States. Rather, it occurred in Mexico under the sovereign power of the Mexican government. Thus stripped of all its case support, the majority's broad reading of the Constitution's extraterritorial reach finds support only in citations to academic literature. Law review articles, however, are not the law.

Extending the protective veil of the Constitution to constrain the actions taken by our agents abroad against foreign nationals residing in foreign territory would be entirely inconsistent with the view that the Constitution embodies a contract between the people of the United States and its government. On the contrary, as I observed at the beginning of my dissent, the Supreme Court has explicitly declared that "[n]either the Constitution nor the laws passed in pursuance of it have any force in foreign territory unless in respect of our own citizens." *Curtiss–Wright,* 299 U.S. at 318, 57 S.Ct. at 220. Consistent with this principle, the Supreme Court has long recognized that aliens who are beyond the territorial limits of the United States stand on a different constitutional footing than those residing either permanently or temporarily within our borders. For instance,

while the Court has recognized in the immigration context that "an alien who has entered the country, and has become subject in all respects to its jurisdiction, and a part of its population" is entitled to due process under the fifth amendment, *The Japanese Immigrant Case,* 189 U.S. 86, 101, 23 S.Ct. 611, 614, 47 L.Ed. 721 (1903), aliens who have not yet entered our borders are accorded only that degree of process provided by "the decisions of executive or administrative officers, acting within powers expressly conferred by Congress." *Nishimura Ekiu v. United States,* 142 U.S. 651, 660, 12 S.Ct. 336, 339, 35 L.Ed. 1146 (1892). Congress may, in fact, "exclude [an alien] in the first instance for whatever reason it sees fit," because "an alien obviously brings with him no constitutional rights." *Bridges v. Wixon,* 326 U.S. 135, 161, 65 S.Ct. 1443, 1455, 89 L.Ed. 2103 (1945) (Murphy, J., concurring); *see also United States ex rel. Turner v. Williams,* 194 U.S. 279, 292, 24 S.Ct. 719, 723, 48 L.Ed. 979 (1904) (*Turner*) (an alien attempting to enter this country illegally is not one of the people to whom first amendment rights are secured).

An uninterrupted line of cases reaffirms to the present day this distinction between the constitutional rights of excludable aliens, those seeking admission into the United States, and deportable aliens, those already within the United States. *See, e.g., Landon v. Plasencia,* 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982) (*Plasencia*); *Leng May Ma v. Barber,* 357 U.S. 185, 187, 78 S.Ct. 1072, 1073, 2 L.Ed.2d 1246 (1958); *Kwong Hai Chew,* 344 U.S. at 600, 73 S.Ct. at 479 (" 'excludable' aliens . . . are not within the protections of the Fifth Amendment" ). Moreover, the Court in *Kwong Hai Chew,* quoting an earlier decision, carefully reminded us that "in extending constitutional protections beyond the citizenry, the Court has been at pains to point out that it was the alien's presence within its territorial jurisdiction that gave the Judiciary power to act." 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477 n. 5, *quoting Johnson v. Eisentrager,* 339 U.S. 763, 770–71, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950)

(*Johnson*) (holding that nonresident enemy aliens who had never been in the United States were not entitled to constitutional protections). It is, therefore, clear that our Bill of Rights distinguishes between resident and nonresident aliens. *See Kwong Hai Chew*, 344 U.S. at 596, 73 S.Ct. at 477 (a permanent resident is a person within the meaning of the fifth amendment).

The significance of residency within the United States to the question of the constitutional rights of aliens crystallizes when considered in the context of the compact theory. In discussing the greater rights that attach as one progresses from the status of a nonresident alien to a permanent resident alien to a naturalized citizen, the Court in *Johnson* implicitly recognized that as the concomitant to assuming ever-increasing obligations to the United States, one receives correspondingly greater rights. 339 U.S. at 769–71, 70 S.Ct. at 939–40. By voluntarily establishing residency within the United States, whether temporarily or permanently, aliens owe a local and temporary allegiance to the United States during the period of their residency. *See Carlisle v. United States*, 83 U.S. (16 Wall.) 147, 154, 21 L.Ed. 426 (1873). As a consequence of this obligation of allegiance, aliens are entitled to many of the same rights as citizens. *See Johnson*, 339 U.S. at 770, 70 S.Ct. at 939. These rights, as I pointed out earlier, increase as an alien develops increasingly greater ties that evidence an intent to make the United States his permanent residence. *See id.; Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329.

An alien who chooses to establish his residency in the United States, however, like any citizen, pays a price for these rights over and beyond the exaction of his temporary allegiance. In return for these constitutional guarantees, aliens must assume certain duties and obligations. Indeed, in *Eisler v. United States*, 170 F.2d 273 (D.C.Cir.1948) (*Eisler*), *cert. dismissed*, 338 U.S. 883, 70 S.Ct. 181, 94 L.Ed. 542 (1949), the District of Columbia Circuit explicitly recognized the reciprocal nature of the rights and obligations of aliens residing in the United States:

Once an alien lawfully enters and resides in this country he becomes invested with the rights, except those incidental to citizenship, guaranteed by the Constitution to all people within our borders. Correlatively, an alien owes a temporary allegiance to the Government of the United States, and he assumes duties and obligations which do not differ materially from those of native-born or naturalized citizens....

*Id.* at 279 (citation omitted). Thus, not only do resident aliens owe a duty of allegiance to the United States, but they are bound to obey all laws of the United States other than those related to citizenship, *Radich v. Hutchins*, 95 U.S. 210, 211, 24 L.Ed. 409 (1877), contribute to the support of government, and even be called to serve in the national defense. *See Eisler*, 170 F.2d at 279; *Leonhard v. Eley*, 151 F.2d 409, 410 (10th Cir.1945); Military Selective Service Act, 50 U.S.C.A.App. § 453 (Supp.1988).

The Supreme Court has also acknowledged as a corollary of the social contract theory, the maxim that "the Government's obligation of protection is correlative with the duty of loyal support inherent in the citizen's allegiance." *Johnson*, 339 U.S. at 770, 70 S.Ct. at 939. On the basis of this duty of loyalty, the Court has differentiated between the rights of citizens and nonresident aliens *complaining of unconstitutional actions by United States agents abroad. Id.* Accordingly, some measure of allegiance to the United States, as evidenced by citizenship or residency, is the quid pro quo for receiving the privilege of invoking our Bill of Rights as a check on the extraterritorial actions of United States officials.

My reading of these cases convinces me that the scope of an alien's rights depends intimately on the extent to which he has chosen to shoulder the burdens that citizens must bear. Not until an alien has assumed the complete range of obligations that we impose on the citizenry may he be considered one of "the people of the United States" entitled to the full panoply of rights guaranteed by our Constitution.

I conclude, therefore, that Verdugo, as a nonresident Mexican citizen, does not enjoy the full panoply of rights guaranteed to "the people of the United States" by our Constitution. His obligation to refrain from violating our drug laws in his dealings with our citizens does not place upon him a burden sufficient to entitle him to the entire spectrum of constitutional rights available to citizens or resident aliens. He has neither undertaken to support our government, nor has he placed himself in a position where he might be called to serve in the national defense. More important, however, as a nonresident alien, he has assumed no duty of allegiance to the United States.

This is not to say that Verdugo receives no rights whatsoever in exchange for his obligation to stand trial in the United States for alleged violations of our narcotics laws. I do not question that he is entitled to a fair judicial trial. Even as a nonresident alien, Verdugo is cloaked with fifth and sixth amendment rights during the actual charging and trial process in a criminal prosecution. Nearly a century ago, when Congress sought to criminalize violations of our immigration laws by subjecting aliens unlawfully present in this country "to infamous punishment at hard labor, or by confiscating their property," the Supreme Court held that "such legislation, to be valid [under the Constitution], must provide for a judicial trial to establish the guilt of the accused." *Wong Wing*, 163 U.S. at 237, 16 S.Ct. at 981; *Turner*, 194 U.S. at 291, 24 S.Ct. at 792. While the Court's decision was motivated in part by separation-of-powers or bill-of-attainder concerns, *see* 163 U.S. at 237, 16 S.Ct. at 981; 194 U.S. at 291, 24 S.Ct. at 792, it was also based upon the Court's interpretation of the fifth and sixth amendments as applying on their face to "all persons within the territory of the United States." *Wong Wing*, 163 U.S. at 238, 16 S.Ct. at 981. Hence, the Court ruled that "even aliens shall not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law." *Id.* I believe that

by providing Verdugo with fifth and sixth amendment protections during the charging and trial phases of the criminal process, our government has given him ample consideration to justify subjecting him to our drug laws.

## II

Verdugo, however, was detained in the United States on criminal charges at the time that his Mexicali residence was searched. This circumstance suggests two additional inquiries. First, one must ask whether Verdugo's physical presence in this country at the time the search occurred conferred upon him a "residence" status sufficient to trigger extraterritorial fourth amendment rights. Next, one must determine whether the fact that he was under criminal prosecution when the search took place carries any special significance for our fourth amendment jurisprudence.

### A.

Being held in custody in the United States pending the disposition of criminal charges does not, in itself, establish the residency required to trigger fourth amendment protections. Long ago, the Supreme Court intimated that an alien "who has been here for too brief a period to have become, in any real sense, a part of our population," might not be eligible to invoke the due process clause of the fifth amendment. *See The Japanese Immigrant Case*, 189 U.S. at 100, 23 S.Ct. at 614; *cf. Leng May Ma v. Barber*, 357 U.S. 185, 187–88, 78 S.Ct. 1072, 1073–74, 2 L.Ed.2d 1246 (1958) (alien detained in custody pending determination of his admissibility is not "within the United States" although alien is physically present in United States). By emphasizing that its holding applied only to aliens who had resided in this country long enough to be considered "part of the population," 189 U.S. at 100–01, 23 S.Ct. at 614, the Court in *The Japanese Immigrant Case* acknowledged that the mere fact that one is physically present in the United States did not elevate one to the status of a resident alien endowed with the full panoply of constitu-

tional protections. While the Court has subsequently recognized that the fifth amendment's guarantee of due process of law applies even to aliens "whose presence in this country is unlawful, involuntary, or transitory," *Mathews v. Diaz*, 426 U.S. 67, 77, 96 S.Ct. 1883, 1890, 48 L.Ed.2d 478 (1976) (*Mathews*), the Court also immediately thereafter cautioned that "[t]he fact that all persons, aliens and citizens alike, are protected by the Due Process Clause does not lead to the further conclusion that all aliens are entitled to enjoy all the advantages of citizenship, or indeed, to the conclusion that all aliens must be placed in a single homogeneous legal classification." *Id.* at 78, 96 S.Ct. at 1890.

*Mathews*'s admonition is unremarkable. As we observed earlier, differentiating among different noncitizens based upon different circumstances has always been a part of our jurisprudence. That the protections of our Bill of Rights are not an all-or-nothing proposition where aliens are concerned was previously recognized by the Court in *Turner*. In that case, the Court saw no inconsistency in reaffirming its prior holding in *Wong Wing*, 163 U.S. at 238, 16 S.Ct. at 981, that the fifth and sixth amendments apply to criminal proceedings brought against illegal aliens, while, at the same time, opining that such aliens had no first amendment rights. *Turner*, 194 U.S. at 291–92, 24 S.Ct. at 722–23. Subsequently, in *Balzac*, 258 U.S. at 312, 42 S.Ct. at 348, the Court recognized that while the Constitution is "in force" wherever our sovereign power is exerted, as in our territories, "[t]he Constitution ... contains grants of power and limitations which in the nature of things are not always and everywhere applicable." Clarifying its prior decisions regarding the scope of constitutional protections in our insular possessions, the Court observed that "the real issue [in those cases] was not whether the Constitution extended to [our territories] when we went there, but *which* of its provisions were applicable by way of limitation upon the exercise of executive and legislative power in dealing with new conditions and requirements." *Id.* According to *Balzac*, even where the United States is sover-

eign, the protections of the Constitution do not always extend indiscriminately to territories outside of the fifty states. Where the United States is *not* sovereign, as in Mexico, our constitutional protections may apply even more selectively. Hence, while Verdugo's brief, involuntary presence in this country may confer upon him fifth and sixth amendment rights during the criminal proceedings against him, it does not follow from this that, as a *nonresident alien* complaining of a United States search that occurred on soil over which it is *not* sovereign, he is also invested with the protections of the fourth amendment.

Subsequent to its decisions in *Turner* and *Balzac*, the Supreme Court has recognized that aliens within our borders have "been accorded a generous and ascending scale of rights as [they] increase[ ] [their] identity with our society." *Johnson*, 339 U.S. at 770, 70 S.Ct. at 939; *accord Kwong Hai Chew*, 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477 n. 5. "Mere lawful presence in the country creates an implied assurance of safe conduct and gives [the alien] certain rights; they become more extensive and secure when he makes a preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization." *Johnson*, 339 U.S. at 770, 70 S.Ct. at 940; *accord Kwong Hai Chew*, 344 U.S. at 596–97 n. 5, 73 S.Ct. at 477 n. 5. More recently, in *Plasencia*, 459 U.S. at 32, 103 S.Ct. at 329, the Court recognized that while "an alien seeking initial admission to the United States requests a privilege and has no constitutional rights ... once an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly." Thus, the degree of constitutional protection applicable to an alien is heavily dependent on the ties that he develops with this country through his residency status. Undoubtedly, the lack of constitutional protection for aliens residing outside our borders reflects their want of ties. Absent an intention to form bonds with the United States, no constitutional compact can be fairly implied.

We have been taught by the Supreme Court that nonresident aliens are not bestowed with the entire package of rights secured by the Bill of Rights. Knowing this, however, does not, in itself, tell us whether a nonresident alien is cloaked with extraterritorial fourth amendment rights simply by virtue of the fact that he was in custody in the United States when the search took place. While our precedent is indeterminate on this point, my reading of the language and history of the Constitution convinces me that while nonresident aliens may invoke the fifth and sixth amendments at trial, they may not fall back upon the fourth amendment to complain about a foreign search conducted by United States agents. As I have already observed, the fourth amendment extends its guarantees to "the people," meaning "the people of the United States." Elsewhere in the Bill of Rights, the Framers sought to constrain the reach of the federal government in the name of "the people." Besides the fourth amendment, the name of "the people" is specifically invoked in the first, second, ninth, and tenth amendments. Presumably, "the people" identified in each amendment is coextensive with "the people" cited in the other amendments. No contrary indication appears in either the text or history of the Constitution.

Reading the foregoing amendments together in a self-consistent fashion, I cannot hold that "the people" includes within its ambit nonresident aliens who, for whatever reason, happen to find themselves temporarily in this country. In *Turner*, 194 U.S. at 292, 24 S.Ct. at 723, an excludable alien who had illegally entered the United States sought to invalidate a statute permitting Congress to exclude anarchists on the grounds that it violated his first amendment rights. The Supreme Court responded that such an alien did not become one of "the people" entitled to invoke the first amendment's protections merely by illegally entering this country. *Id.* Reading "the people" in the first and fourth amendments consistently would lead one to the same result for the fourth amendment. *A fortiori*, where the alleged unconstitutional ac-

tions occur in a *foreign* territory, a person in Verdugo's circumstance is in no position to appeal to the fourth amendment as one of "the people" of the United States.

The definitions of those entitled to fifth and sixth amendment protections are broader. Those rights are not restricted to "the people" but the fifth amendment protects every "person" while the sixth amendment protects every "accused." Despite this clear difference in the language of the fifth and sixth amendments, as compared with that of the fourth amendment, the majority continues to insist that "[i]t would be odd indeed to acknowledge that Verdugo–Urquidez is entitled to due process under the fifth amendment, and to a fair trial under the sixth amendment, both of which rights he is accorded under established constitutional jurisprudence, and deny him the protection from unreasonable searches and seizures afforded under the fourth amendment." Maj. op. at 1224. Relying on the dictum of the plurality and the four dissenting opinions in *INS v. Lopez–Mendoza*, 468 U.S. 1032, 104 S.Ct. 3479, 82 L.Ed.2d 778 (1984) (*Lopez–Mendoza*), implying that *illegal* aliens have fourth amendment rights against unreasonable searches and seizures by INS officers, the majority further urges that it would be inconsistent to deny Verdugo fourth amendment rights in this case. According to the majority, "it seems absurd to grant the protection of the fourth amendment to one whose presence in the country is voluntary although illegal, and yet deny it to Verdugo–Urquidez, whose presence in the United States, although legal, is plainly involuntary." Maj. op. at 1224.

These statements by the majority indicate that it has overlooked what I believe to be the crucial distinction between the cases cited by the majority and the instant case. When government officials violate a person's fifth and sixth amendment rights *at trial*, the constitutional infringement occurs *within the United States*. By contrast, when government officials violate a person's expectations of privacy in foreign territory, the complained of actions occur *on foreign soil*. In other words, the opera-

tive distinction between this case and the cases relied upon by the majority is *the locus of governmental action.* The fatal flaw in the majority's reliance on cases that have since extended various constitutional rights to aliens, whether they are legal or illegal, resident or mere visitor, is that none of these cases involves *extraterritorial* actions taken by our officials against aliens. Each one of these cases cited by the majority impose restraints on actions taken within United States territory by the government. The challenged actions of the DEA agents in Verdugo's case, by contrast, occurred in Mexico under the sovereignty of the Mexican government. Hence, whether an alien is legally or illegally in this country, whether he is a permanent resident or temporary sojourner, or, for that matter, whether he was within or without United States jurisdiction at the time the acts occurred is not the decisive question in this case. Rather, the dispositive question with respect to Verdugo is where the unconstitutional actions of our government's agents took place. Simply put, not a single case cited by the majority extends constitutional protections to a nonresident alien with respect to actions taken by our officials on foreign soil. Thus, the majority's analysis is completely wide of the mark.

By focusing on the locus of government action, any apparent inconsistency between a holding that Verdugo is not entitled to *extraterritorial* fourth amendment rights and the Supreme Court's dicta in *Lopez–Mendoza* quickly vanishes. Equally important, focusing on where the government action occurred is the only way that the Supreme Court's various pronouncements on the constitutional rights of aliens can be reconciled. In the absence of a clear indication by the Court itself that it is overruling an earlier precedent, I believe that, as a circuit court, we are obligated to reconcile any apparent divergence in the Court's precedents as best we can. As I see it, we are faced with three guiding principles. First, the cases cited by the majority establish that all aliens are entitled to constitutional protections while they are in this country. *See, e.g., Yick Wo,* 118 U.S. at 369, 6 S.Ct. at 1070; *Wong Wing,* 163 U.S.

at 238, 16 S.Ct. at 981; *Turner,* 194 U.S. at 291, 24 S.Ct. at 722; *Mathews,* 426 U.S. at 77, 96 S.Ct. at 1890; *Plyler,* 457 U.S. at 211, 102 S.Ct. at 2391. Second, the Constitution apparently follows American *citizens* when they go abroad. *See Reid,* 354 U.S. at 6, 77 S.Ct. at 1225. Third, the *extraterritorial* force of the Constitution does not apply to persons other than our citizens or, perhaps, aliens with significant ties to the United States. *See Curtiss–Wright,* 299 U.S. at 318, 57 S.Ct. at 220; *Johnson,* 329 U.S. at 770, 70 S.Ct. at 939. The only way that all three principles can be reconciled is if aliens are accorded constitutional protections as against governmental action occurring in United States territory but not as against governmental action occurring on foreign soil. But, as I have previously observed, the majority does not attempt to solve its dilemma because it neglects to mention, much less distinguish, the Supreme Court's express restriction of the Constitution's extraterritorial life to American citizens in *Curtiss–Wright* and *Johnson.* Having completely ignored these cases, it comes as no surprise that the majority fails to recognize that the locus of the alleged unconstitutional action should determine whether an alien is entitled to constitutional protections.

Thus, as a matter of constitutional interpretation, no inconsistency results from holding that nonresident aliens are entitled to the same fifth and sixth amendment rights in a criminal proceeding as are citizens, while at the same time concluding that such aliens are not entitled to the extraterritorial protections that might conceivably apply to American citizens abroad. The American flag simply does not follow nonresident aliens beyond our territorial limits. As pointed out before, the Supreme Court has recognized that nonresident aliens do not stand on the same footing as American citizens when complaining of alleged unconstitutional actions of our agents in foreign countries. *See Johnson,* 339 U.S. at 770, 70 S.Ct. at 939.

### B.

I next inquire whether my conclusion that a nonresident alien may not invoke the

protections of the fourth amendment for foreign searches should be altered by the fact that Verdugo was under criminal prosecution at the time the search occurred. Having determined that the commands of the fourth amendment do not apply to extraterritorial searches of the residences of nonresident aliens who find themselves in custody in this country, I can find no basis for holding that the fourth amendment attaches merely because the subject of the search is under criminal prosecution in the United States. As I stated earlier, the fact that Verdugo, a foreign national, may be called to account for violations of our drug laws is insufficient to cloak him with the entire mantle of rights enjoyed by American citizens abroad. Hence, unlike a citizen or, perhaps, a permanent resident alien, Verdugo is not entitled under Supreme Court precedent to invoke the Constitution as a check on the actions of our government's DEA agents in Mexico.

I am aware of cases intimating that certain constitutional guarantees apply to anyone brought within the United States to be tried for a criminal offense. But as I indicated in part I.C., those cases are readily distinguishable because they relate to rights of the accused arising under the fifth and sixth amendments, which ensure fairness during the trial process itself. In *In re Ross,* for example, the Court suggested that anyone brought within the United States to be criminally prosecuted can invoke the sixth amendment's guarantees of a grand jury indictment and trial by jury. 140 U.S. at 464, 11 S.Ct. at 900. *Ross*'s holding, however, follows from the identical premise as the Court's decision in *Wong Wing,* namely, that the fifth and sixth amendments apply in a criminal proceeding to anyone, citizen and alien alike, within the territorial limits of the United States. 163 U.S. at 238, 16 S.Ct. at 981. In part II.A., I explained that under Supreme Court precedent, a nonresident alien can claim the protections of the Constitution *only* against governmental action perpetrated within territory under United States sovereignty. Fifth and sixth amendment violations during a trial conducted in the United States obviously involve acts occurring within

United States territory. Unlike the right to a jury trial or to due process of law, however, fourth amendment violations do not occur at trial. Violations of the fourth amendment occur at the time the government intrudes unreasonably into a citizen's legitimate sphere of privacy. *U.S. v. Leon,* 468 U.S. 897, 906, 104 S.Ct. 3405, 3411, 82 L.Ed.2d 677 (1984) *(Leon); United States v. Calandra,* 414 U.S. 338, 354, 94 S.Ct. 613, 623, 38 L.Ed.2d 561 (1974) *(Calandra).* No independent violation of the fourth amendment occurs when illegally seized evidence is introduced into a criminal proceeding. *Leon,* 468 U.S. at 906, 104 S.Ct. at 3411; *United States v. Janis,* 428 U.S. 433, 458–59 n. 35, 96 S.Ct. 3021, 3034, n. 35, 49 L.Ed.2d 1046 (1976) *(Janis).* Because Verdugo is not entitled to challenge the extraterritorial search of his residence, there is no fourth amendment bar to admitting the drug tally sheets in the criminal proceedings against him.

Nor does our prior decision in *United States v. Peterson,* 812 F.2d 486 (9th Cir. 1987), in which we had occasion to discuss the extraterritorial application of the fourth amendment, call for a different result. Unlike Verdugo, the appellants in *Peterson* were apparently American citizens. In that case, moreover, we did not hold that the fourth amendment applied to extraterritorial searches; we *assumed* for purposes of the appeal that the fourth amendment applied, but concluded that even if it applied to the foreign search in question, the federal officers' alleged misconduct overseas was excused under *Leon*'s good faith exception to the exclusionary rule. *Id.* at 489, 491–92. Further, *Peterson* involved a search upon the high seas, an area of law governed by its own separate doctrine. *Id.* at 489. *Peterson* is thus inapplicable to the facts of this case.

With the exception of *United States v. Toscanino,* 500 F.2d 267 (2d Cir.1974) *(Toscanino),* which I will address in part III, the cases relied upon by the district court in support of its determination that the fourth amendment applies to the search of Verdugo's home in Mexico are either distinguishable or inapposite. *Cardenas v.*

*Smith,* 733 F.2d 909, 915–17 (D.C.Cir.1984), suggested that a Colombian national might have standing to challenge violations of the fourth and fifth amendments resulting from a seizure of her Swiss bank account. By its own terms, however, the suggestion was mere dictum. *Id.* at 917. The court remanded the case for a finding of whether she was "in that group of aliens who are the intended beneficiaries of the relevant constitutional guarantees," and expressly refused to give any opinion on whether she would be able to establish standing. *Id.* Similarly, the statement in *Jean v. Nelson,* 727 F.2d 957, 973 (11th Cir.1984), *aff'd on other grounds,* 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), that "aliens who are the victims of unconstitutional government action abroad are protected by the Bill of Rights if the government seeks to exploit fruits of its unlawful conduct in a criminal proceeding in the United States," was dictum because the Eleventh Circuit had no occasion to apply it to that case.

The district court also invoked *United States v. Cortes,* 588 F.2d 106, 110 (5th Cir.1979), and *United States v. Demanett,* 629 F.2d 862, 866 (3d Cir.1980), *cert. denied,* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed. 2d 333 (1981), for the proposition that aliens may mount fourth amendment challenges to searches beyond the United States' territorial jurisdiction. Those cases, however, involved the boarding of vessels on the high seas, and are therefore distinguishable from the facts of this case. Searches on the high seas raise unique questions of sovereignty. "The high seas are generally not subject to the sovereignty of any state." Carmichael, *At Sea With the Fourth Amendment,* 32 U. Miami L.Rev. 51, 58 & n. 28 (1977) (*Carmichael*). "[U]nlike land borders, the region beyond the territorial boundaries at sea is not subject to the exclusive jurisdiction of any other sovereign and can be patrolled by United States vessels." Note, *High on the Seas: Drug Smuggling, The Fourth Amendment, and Warrantless Searches at Sea,* 93 Harv.L.Rev. 725, 733 & n. 46 (1980) (*Note*).

Each nation is accorded a limited right of sovereignty under maritime law over any vessel whose passage may affect certain national interests. Hence, a complex web of statutes, treaties, conventions, and universally accepted principles of international law authorizes the Coast Guard to board both foreign and domestic vessels on the high seas and within our territorial waters if such vessels are suspected of violating our laws. *See generally Church v. Hubbart,* 6 U.S. (2 Cranch) 187, 234–35, 2 L.Ed. 249 (1804); *United States v. Williams,* 617 F.2d 1063, 1079–84 (5th Cir.1980); *Carmichael* at 51–75 & accompanying notes; *Note* at 725–27 & accompanying notes. A vessel thus boarded becomes subject to our complete jurisdiction and sovereign power. Because "[t]he Constitution of the United States is in force ... wherever and whenever the *sovereign* power of [our] government is exerted," *Balzac,* 258 U.S. at 312–13, 42 S.Ct. at 348 (emphasis added), it is not surprising that searches on the high seas may be subject to the fourth amendment, even when they are manned by foreign nationals.

In contrast, the residence of a foreign national on foreign soil is subject to the jurisdiction and control of the *foreign* sovereign. Consequently, such a foreign residence is not protected by the Constitution, for "[n]either the Constitution nor [our] laws ... have any force in foreign territory unless in respect of our own citizens." *Curtiss–Wright,* 299 U.S. at 318, 57 S.Ct. at 220. Verdugo's residences in Mexico were at all times under Mexican sovereignty. The DEA agents were in Mexico only as guests of the Mexican sovereign and were able to search Verdugo's residences only at the Mexican sovereign's pleasure. Hence, the cases involving searches on the high seas are inapplicable to the searches of Verdugo's residences in Mexico.

Nor does our prior decision in *In re Air-crash in Bali, Indonesia on April 22, 1974,* 684 F.2d 1301 (9th Cir.1982) (*Bali*), govern this appeal. We granted Australian plaintiffs in that case standing to challenge the constitutionality of the Warsaw Convention's limitation on liability in air carrier accidents. We recognized that under *Wong Wing,* 163 U.S. at 238, 16 S.Ct.

at 981, "persons" within the meaning of the fifth amendment included all "persons who have a valid claim over which our federal courts have jurisdiction." *Bali,* 684 F.2d at 1308 n. 6. To the extent that Congress gave these nonresident aliens the right to sue in our courts for torts committed by Americans, the aliens should have standing to object to statutes that deprive them of their damages. Further, the alleged constitutional violations, the application of the Warsaw Convention's liability limits to their claims, occurred in the United States, not abroad. Finally, while acknowledging that "there are undoubtedly constitutional provisions the protection of which nonresident aliens may not claim," we held that where a treaty such as the Warsaw Convention applies generally on its face to both residents and nonresidents of the United States, the fifth amendment would not permit "the application of *different rules of decision to residents and non-residents suing on the same cause of action in the same court." Id.* (citation omitted). *Bali,* then, has no bearing on the question whether a nonresident alien under criminal prosecution in the United States may invoke the fourth amendment's exclusionary rule to seek suppression of evidence seized from his residence abroad.

### III

Having concluded that the fourth amendment does not apply to the search of Verdugo's residence, I next inquire whether the exclusion of the evidence seized in this case can be justified on some other ground. Application of the exclusionary rule, after all, presupposes a fourth amendment violation. *United States v. Benevento,* 836 F.2d 60, 69 (2d Cir.1987) (because the fourth amendment does not apply to routine border searches, neither does the exclusionary rule); *United States v. Dominguez,* 604 F.2d 304, 312 (4th Cir.1979), *cert. denied,* 444 U.S. 1014, 100 S.Ct. 664, 62 L.Ed.2d 644 (1980). The district court's decision suggests two possible alternative bases for suppressing the evidence in this case. The first basis is suggested in *Toscanino,* 500 F.2d at 286, which held that "aliens who are the victims of unconstitu-

tional action abroad" may invoke the protections of the Bill of Rights to prevent the government from "exploit[ing] the fruits of its unlawful conduct in a criminal proceeding against the alien in the United States." Second, the district court's opinion suggests that courts possess inherent power to require that foreign searches conform to the requirements of the fourth amendment. I will address these two theories in turn.

### A.

In *Toscanino,* the Second Circuit suggested that a nonresident foreign national could invoke the fourth amendment to protest the seizure of evidence by United States agents abroad. 500 F.2d at 280–81. The district court, relying on *Toscanino,* stated "[i]t seems unlikely that the Fourth Amendment was not intended to protect an alien, already in the custody of the United States and charged in a criminal complaint, from searches of his foreign residences conducted by United States agents for the express purpose of obtaining evidence relevant to the pending prosecution." To the extent that *Toscanino* rests on the proposition that aliens in Verdugo's position may seek suppression of evidence seized abroad under the fourth amendment, I reject its conclusion. The majority in *Toscanino* cited no authority, nor did it provide any sound reasoning, for its expansive holding. The majority merely concluded, without explanation, that because United States citizens were protected by the fourth amendment abroad, and because aliens in the United States are protected by the fourth amendment within our borders, that "no sound reason" justified a different rule for nonresident aliens. *Id.* This is the same logical fallacy to which the majority in the instant case falls prey. As I stated earlier, I believe that sound reasons exist to distinguish between a *foreign* search of property belonging to a nonresident alien and a *domestic* search of property belonging to any alien or a foreign search of property belonging to an American citizen.

However, as Judge Anderson pointed out in his concurrence, the majority in *Toscani-*

*no* could have reached its result on due process grounds, without deciding the question whether the Bill of Rights has extraterritorial application to foreign nationals. *Id.* at 281. *Toscanino* presented a unique fact situation. Toscanino, an Italian citizen, alleged that he was kidnapped from his home in Uruguay, tortured, and illegally brought within the territorial jurisdiction of the United States and that, prior to his abduction, American officials had unlawfully gathered evidence against him through electronic surveillance of his telephone. *Id.* at 268. He not only challenged the introduction of the evidence seized in Uruguay, but also the power of the district court to assert jurisdiction over his person. Confronting the Second Circuit was a long line of authority first announced in *Ker v. Illinois,* 119 U.S. 436, 7 S.Ct. 225, 30 L.Ed. 421 (1886), and unequivocally reaffirmed in *Frisbie v. Collins,* 342 U.S. 519, 72 S.Ct. 509, 96 L.Ed. 541 (1952), holding that the district court's power to try a person for a crime was not vitiated by the fact that he was brought within its jurisdiction by "forcible abduction." 500 F.2d at 271–72. The Second Circuit, however, argued that since *Frisbie,* the Supreme Court had expanded the fifth amendment's guarantee of due process "to bar the government from realizing directly the fruits of its own deliberate and unnecessary lawlessness in bringing the accused to trial." *Id.* at 272. Citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952) (*Rochin*), the Second Circuit recognized that "the Supreme Court broadened its interpretation of due process to set aside for the first time a state court conviction resting on evidence obtained through police brutality." *Toscanino,* 500 F.2d at 273.

Indeed, the Court in *Rochin* held that the due process clause required it to determine from "the whole course of the proceedings ... whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples even toward those charged with the most heinous offenses." 342 U.S. at 169, 72 S.Ct. at 208. The Court was careful, however, to clarify that the conduct involved in that case offended more than "some fastidious squeamishness or private sentimentalism about combatting crime too categorically." *Id.* at 172, 72 S.Ct. at 209. Rather, it was conduct that "shocks the conscience." *Id.* Subsequently, relying on *Rochin,* the Court in *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), suggested in dictum that while certain law enforcement practices may not violate the Constitution or federal law, they may be "so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643.

But the reasoning that underlies *Rochin* and its progeny stems not from the fourth but the fifth amendment. Analyzed under the fifth amendment, *Toscanino* could be harmonized with other precedent. *See* 500 F.2d at 281 (Anderson, J., concurring in the result). Toscanino alleged circumstances surrounding the seizure of his person and delivery into the court's jurisdiction which would offend the sensibilities of any civilized person. He was allegedly taken blindfolded and at gunpoint to Brazil and held captive for three weeks of interrogation while being subjected to inhumane forms of physical torture by United States officials. *Id.* at 269–70. According to Toscanino,

> his captors denied him sleep and all forms of nourishment for days at a time. Nourishment was provided intravenously in a manner precisely equal to an amount necessary to keep him alive. Reminiscent of the horror stories told by our military men who returned from Korea and China, Toscanino was forced to walk up and down a hallway for seven or eight hours at a time. When he could no longer stand he was kicked and beaten but all in a manner contrived to punish without scarring. When he would not answer, his fingers were pinched with metal pliers. Alcohol was flushed into his eyes and nose and other fluids ... were forced up his anal passage. Incredibly, these agents of the United States government attached electrodes to Toscanino's earlobes, toes, and genitals.

Jarring jolts of electricity were shot throughout his body, rendering him unconscious for indeterminate periods of time but again leaving no physical scars. *Id.* at 270.

Despite the truly revolting circumstances that were alleged in *Toscanino*, its due process holding is of doubtful validity. To the extent that *Toscanino* was based on the Second Circuit's belief that the *Ker–Frisbie* doctrine may no longer be good law, its rationale has been substantially undermined by subsequent Supreme Court decisions that have wholeheartedly and repeatedly reaffirmed the *Ker–Frisbie* rule. *See, e.g., Lopez–Mendoza,* 468 U.S. at 1039–40, 104 S.Ct. at 3483–84; *United States v. Crews,* 445 U.S. 463, 474, 100 S.Ct. 1244, 1251, 63 L.Ed.2d 537 (1980); *id.* at 477–79, 100 S.Ct. at 1253–54 (Powell, J., concurring in part) (White, J., concurring in result) (majority of court reaffirming *Frisbie* ); *Stone v. Powell,* 428 U.S. 465, 485, 96 S.Ct. 3037, 3048, 49 L.Ed.2d 1067 (1976) (*Stone* ); *Gerstein v. Pugh,* 420 U.S. 103, 119, 95 S.Ct. 854, 865, 43 L.Ed.2d 54 (1975). Indeed, the majority acknowledges that in a case following *Toscanino,* the Second Circuit clarified that its due process holding in *Toscanino* was largely impelled by the outrageous acts of kidnap and torture conducted by United States agents. *See United States ex rel. Lujan v. Gengler,* 510 F.2d 62, 65–66 (2d Cir.) (*Gengler* ), *cert. denied,* 421 U.S. 1001, 95 S.Ct. 2400, 44 L.Ed.2d 668 (1975). Although it was not confronted with a fourth amendment issue in that case, the Second Circuit in *Gengler* held that absent "the use of torture, brutality and similar outrageous conduct" condemned in *Toscanino,* the district court was not required to divest itself of jurisdiction over a person who was forcibly abducted in Bolivia and brought into the United States. *Id.* at 68.

By maintaining that the fourth amendment, and hence its exclusionary rule, does not apply to searches of foreign nationals on foreign soil by United States agents, I do not suggest that a federal court can never exclude from a criminal proceeding evidence obtained abroad against an alien by United States officers. To the extent that *Toscanino* recognized that aliens may invoke the fifth amendment to challenge the admission of evidence that was obtained through means that "shock the conscience," I find the case unobjectionable. This rule is consistent with those cases suggesting that the fifth amendment applies to anyone, citizen and alien alike, subject to criminal prosecution in the United States. *Wong Wing,* 163 U.S. at 238, 16 S.Ct. at 981. We have previously speculated that such a "shock-the-conscience" test might apply to an extraterritorial search of an American citizen in a proper case. *See Stonehill v. United States,* 405 F.2d 738, 745 (9th Cir.1968) (*Stonehill* ), *cert. denied,* 395 U.S. 960, 89 S.Ct. 2102, 23 L.Ed.2d 747 (1969).

Whether this court should embrace such a due process "shock-the-conscience" test, however, is not a question that needs to be reached in this case. For even if this court were to adopt that test, the conduct of the DEA agents in searching Verdugo's residence is simply not comparable to the official acts of torture, brutality, or other outrageous invasions of a defendant's bodily security that were present in those cases where police conduct was found to "shock the conscience." *See, e.g., Rochin,* 342 U.S. 165, 166, 72 S.Ct. 205, 206 (evidence seized by forcing emetic solution into his stomach to induce vomiting); *Irvine v. California,* 347 U.S. 128, 133, 74 S.Ct. 381, 383, 98 L.Ed. 561 (1954) (suggesting that "shock-the-conscience" test applies only to cases of violence and brutality comparable to *Rochin* ); *United States v. Mount,* 757 F.2d 1315, 1323 & n. 6 (D.C.Cir.1985) (Bork, J., concurring) (declining to exclude, on grounds that it "shocks the conscience," evidence seized abroad in an allegedly improper search); *Stonehill,* 405 F.2d at 745 (refusing to apply due process "shocks-the-conscience" test to raid of defendant's business premises by Philippine authorities). Indeed, Verdugo does not appeal the district court's ruling that its jurisdiction over him is not barred by the manner in which the government obtained his custody. Exclusion of the drug tally sheets seized in

this case is therefore not warranted by any possible due process concerns.

Because Verdugo does not challenge the district court's adverse ruling on its jurisdiction over him, the majority's discussion of the circumstances of his arrest by Mexican police and transport across the border into United States custody is both irrelevant and gratuitous. Such circumstances are not pertinent to the fourth amendment issue and, therefore, should have played no role in the majority's decision.

### B.

Finally, I will discuss whether the district court possessed inherent supervisory power to suppress the evidence seized by the DEA in this case. The district court concluded that it possessed the inherent power to require that extraterritorial searches conform to the warrant and reasonableness requirements of the fourth amendment for the purpose of ensuring proper police action abroad.

However laudable a policy this may be, a federal judge is without power to exclude evidence merely because he or she disapproves of the particular conduct of governmental agents. In the absence of a constitutional violation, there is simply no authority to justify excluding the evidence in this case. I reject the suggestion that under a vaguely-defined "inherent power" or "supervisory power," courts can devise exclusionary rules either to deter misconduct that falls short of violating the Constitution or to preserve "judicial integrity." Although it is clear that the prime purpose of the exclusionary rule is to deter police misconduct, *Janis,* 428 U.S. at 446, 96 S.Ct. at 3028, it is not designed to deter all misconduct. Rather, it is aimed at deterring only misconduct *that violates the fourth amendment. See id.* (the exclusionary rule "is a judicially created remedy designed to safeguard Fourth Amendment rights ..."); *Calandra,* 414 U.S. at 348, 94 S.Ct. at 620 (same); *see also United States v. Payner,* 447 U.S. 727, 733, 100 S.Ct. 2439, 2445, 65 L.Ed.2d 468 (1980) (*Payner*) (rejecting proposition "that a federal court should use its supervisory power to sup-

press evidence tainted by gross illegalities that did not infringe the defendant's constitutional rights").

In *United States v. Gatto,* 763 F.2d 1040 (9th Cir.1985) (*Gatto*), we recognized that "a court may not exercise any supervisory power absent 'a clear basis in fact and law for doing so.'" *Id.* at 1046, *quoting United States v. Chanen,* 549 F.2d 1306, 1313 (9th Cir.), *cert. denied,* 434 U.S. 825, 98 S.Ct. 72, 54 L.Ed.2d 83 (1977). That we might disapprove of the manner in which government agents conduct their searches does not, in itself, beckon our intervention. *See Gatto,* 763 F.2d at 1046. While I recognize that there are statements in a number of opinions suggesting that the exclusionary rule exists not only to vindicate a defendant's constitutional rights, but also to protect the integrity of the court, *see, e.g., Payner,* 447 U.S. at 735–36 n. 8, 100 S.Ct. at 2446–47 n. 8; *Mapp v. Ohio,* 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961); *Elkins v. United States,* 364 U.S. 206, 222–23, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960) (*Elkins*), our cases have cautioned that "[j]udicial integrity is rarely threatened significantly when executive action does not violate the Constitution, a federal statute, or a procedural rule." *Gatto,* 763 F.2d at 1046. Indeed, the Supreme Court has clarified that "[t]he primary meaning of 'judicial integrity' in the context of evidentiary rules is that the courts must not commit or encourage violations of the Constitution." *Janis,* 428 U.S. at 458–59 n. 35, 96 S.Ct. at 3034 n. 35; *see also Elkins,* 364 U.S. at 223, 80 S.Ct. at 1447 (federal courts should not be accomplices in willful violations of the Constitution). Hence, "[w]hile courts, of course, must ever be concerned with preserving the integrity of the judicial process, this concern has limited force as a justification for the exclusion of highly probative evidence." *Stone,* 428 U.S. at 485, 96 S.Ct. at 3048.

Our concern with "overzealous law enforcement" does not, absent a finding of a constitutional or statutory violation by government officers, give courts a "'chancellor's foot' veto over law enforcement

practices" of which we happen to disapprove. *Gatto,* 763 F.2d at 1046. Contrary to allowing us to impose our conceptions of ideal conduct on our law enforcement officials, the Supreme Court has commanded us to weigh the exclusion of evidence "against the considerable harm that would flow from indiscriminate application of an exclusionary rule." *Payner,* 447 U.S. at 734, 100 S.Ct. at 2445. Application of the exclusionary rule excludes probative evidence, and "exacts a costly toll upon the ability of courts to ascertain the truth in a criminal case." *Id.* Hence, the Court has "consistently recognized that unbending application of the exclusionary sanction to enforce ideals of government rectitude would impede unacceptably the truth-finding functions of judge and jury." *Id.; accord Leon,* 468 U.S. at 907, 104 S.Ct. at 3412; *see also Calandra,* 414 U.S. at 348, 94 S.Ct. at 620.

Congress, I believe, has endorsed this view that the lower federal courts are not at liberty to devise exclusionary rules in order to enforce abstract standards of police conduct. In Fed.R.Evid. 402, Congress has declared that "[a]ll relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, Act of Congress, by these rules [of evidence], or by other rules prescribed by the Supreme Court pursuant to statutory authority."

In view of these considerations, the Supreme Court has refused to allow lower courts to invoke their supervisory or inherent powers to fashion exclusionary rules where established fourth amendment doctrine would not require exclusion of the evidence. *See Payner,* 447 U.S. at 735–36 & n. 8, 100 S.Ct. at 2446 & n. 8. The Court has itself been unwilling to expand the scope of the exclusionary rule, even where the fourth amendment clearly applies and has been violated. *See Stone,* 428 U.S. at 485–86, 96 S.Ct. at 3048. Thus, in its more recent cases, the Court has embraced the primacy of the deterrence rationale for the exclusionary rule, rejecting separate considerations of judicial integrity. *Janis,* 428 U.S. at 446, 96 S.Ct. at 3028 (Deterrence is "the 'prime purpose' of the [exclusionary] rule, if not the sole one."). "Judicial integrity clearly does not mean that the courts must never admit evidence obtained in violation of the fourth amendment." *Id.* at 458 n. 35, 96 S.Ct. at 3034 n. 35. Thus, the Court has established doctrines such as the "good-faith exception" to the exclusionary rule, *see Leon,* 468 U.S. at 908–13, 104 S.Ct. at 3412–15, and the concept that one has no standing to suppress evidence obtained in violation of another's fourth amendment rights. *Alderman v. United States,* 394 U.S. 165, 174, 89 S.Ct. 961, 966, 22 L.Ed.2d 176 (1969). If the Court has refused to apply the exclusionary rule in many cases in which the fourth amendment has been violated, *a fortiori,* neither we nor the district courts are at liberty to impose the rule where no constitutional violation has occurred.

In the case before us, the drug tally sheets seized by the DEA agents are clearly relevant and probative evidence. We can override the "general need for untrammeled disclosure of competent and relevant evidence" only if we can find sufficiently countervailing considerations. *See Elkins,* 364 U.S. at 216, 80 S.Ct. at 1443. In light of my conclusions that the fourth amendment does not apply in this case and that judges are not at liberty to impose an exclusionary rule to enforce their private notions of how our constables should comport themselves, I can find no basis for the suppression in this case.

My conclusion that we are without authority in this case to fashion a new exclusionary rule is reinforced by separation-of-powers concerns that arise whenever courts seek to control the actions of the executive branch abroad. In *Gatto,* we recognized that:

> A federal court that imposes sanctions on executive conduct that is otherwise permitted by the Constitution, a federal statute or a rule will most likely be invading the executive sphere rather than protecting itself from invasion. Similarly, the separation-of-powers principle suggests that the creation of a rule by supervisory power can be justified only

when a recognized [federal] right has been violated.

763 F.2d at 1046. In the present case, any attempt on our part to create a new exclusionary rule would be doubly offensive to principles of separation-of-powers, because we would be attempting to direct the actions of United States executive officials abroad with regard to the citizens of a foreign sovereign. The Executive Branch has plenary authority over foreign relations. *See United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 312, 94 L.Ed. 317 (1950). Few matters are more peculiarly within the jurisdiction of the executive branch of government than the relations between our agents in a foreign country with citizens of that country. The Supreme Court has repeatedly affirmed that "[f]or reasons long recognized as valid, the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of our government. Since decisions in these matters may implicate our relations with foreign powers, ... such decisions are frequently of a character more appropriate to either the Legislature or the Executive than to the Judiciary." *Mathews*, 426 U.S. at 81, 96 S.Ct. at 1892.

If relations between the United States and its alien visitors is a matter for the political branches of government, then *a fortiori* the executive's decisions as to how United States agents abroad should treat the citizens of another sovereignty is a matter beyond the judicial competence. This is an area which by its very nature implicates the executive's diplomatic machinery. "[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89, 72 S.Ct. 512, 519, 96 L.Ed. 586 (1952); *accord Kleindienst v. Mandel*, 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2582–84, 33 L.Ed.2d 683 (1972). No doubt foreign sovereigns, like our own government, are concerned about the treatment of their subjects by agents of another country. Violations of the interests of their citizens by United States agents could certainly affect our diplomatic ties. Safeguarding the interests of foreign citizens in their own country is, however, a responsibility that must ultimately fall on their own government, not our courts.

Moreover, the ability of United States agents in a foreign country to take any action against a citizen of that country often depends, in large part, on the authorization and cooperation of the foreign government. Whether we can obtain such authorization and cooperation depends on our diplomatic relationship with that country. When United States agents act abroad, they act at the pleasure of the host government. As guests acting under another's auspices, they are hardly in a position to demand that a foreign government recognize the force of our Constitution in its own land with respect to its own people. United States agents must conduct themselves as the officials of the host government see fit. To fashion an exclusionary rule in this case would unduly tie the hands of the executive branch in its dealings with foreign nations regarding actions taken with respect to those nation's citizens. *See Toscanino*, 500 F.2d at 281 (Anderson, J., concurring in result).

The separation-of-powers concerns that counsel against creating an exclusionary rule with respect to actions taken abroad by our officials against foreign nationals applies with equal force to the majority's imposition of a warrant requirement in this case. Although the majority recognizes that "a warrant issued by an American magistrate would be a dead letter in Mexico," and that "it would be an affront to a foreign country's sovereignty if the DEA presented an American warrant," maj. op. at 1230, the majority nevertheless proceeds to require a warrant in this case. I find this result very troubling.

First, by imposing a warrant requirement for extraterritorial searches, the ma-

jority opinion conflicts with our implicit holding in *Peterson*, 812 F.2d at 490–92, that a warrant is not required before our agents can conduct an extraterritorial search. In *Peterson*, after concluding that Philippine law enforcement officials were part of a "joint venture" with DEA agents to investigate an international drug-smuggling operation, *id.* at 490, we held that, even if a wiretap conducted in the Philippines by the joint venture were illegal under Philippine law, our DEA agents were entitled to rely in good faith on the assurances of Philippine officials that the wiretap complied with Philippine law. *Id.* at 492. No mention is made in the opinion that the DEA obtained a United States warrant before conducting the wiretap; instead, the opinion suggests that the lawfulness of the search under the fourth amendment turned solely on the question of its "reasonableness." *Id.* at 491 ("local law of the Philippines governs whether the search was reasonable"). The majority in this case attempts to gloss over this essential fact by diverting our attention to a second warrantless search of a vessel on the high seas that was justified by exigent circumstances. *Id.* at 494. However, that search formed the basis for only one of the defendants' evidentiary objections in *Peterson*. The defendants' first contention was that "discovery of the ship and its contraband [was] tainted by unlawful wiretaps participated in by United States officials." *Id.* at 489. If a warrant were required to conduct the foreign wiretap search in *Peterson*, then we would have suppressed the evidence obtained through the illegal wiretap and all of its fruits, including the marijuana subsequently seized in the search of the vessel, whose identity to the DEA was known only as a result of the wiretap. *Id.* at 488–89. Hence, the majority's requirement of a warrant to conduct a foreign search in this case squarely conflicts with *Peterson*'s implicit holding that a warrant is not required in such cases.

By imposing a warrant requirement in foreign searches, the majority creates numerous other problems of both constitutional and pragmatic dimensions. In authorizing American magistrates to issue still-

born search warrants, the majority has written a prescription for advisory opinions, in violation of Article III. Moreover, insofar as the majority's decision allows the judiciary to control the actions of our agents in foreign territory—a matter that is quintessentially the province of the executive branch—the extraterritorial warrant requirement breaches the separation-of-powers between the judicial and executive branches of our government. Finally, the majority's ruling ignores the practical realities that when our agents conduct searches abroad, they are at the mercy of foreign officials. The foreign officials are the ones who decide the scope and reasonableness of any proposed search, whether the search will occur at all, and under what conditions it will be conducted. Even if, in a given case, these foreign officials defer considerably to the requests of our own agents, the fact remains that our agents are conducting the search at the pleasure and under the terms imposed by our foreign hosts.

Needless to say, I do not suggest that we should license United States agents engaged abroad in a criminal investigation to act indiscriminately against foreign nationals. In cases in which our agents obtained evidence by means so outrageous and indecent as to "shock the conscience," such as through torture, due process might require exclusion of such evidence in a criminal proceeding brought against the foreign national in the United States. This is not such a case.

IV

My analysis of the text and history of the Constitution as well as Supreme Court precedent convinces me that a nonresident foreign national in custody in the United States pending criminal prosecution cannot invoke the fourth amendment's protections against a search of his foreign residence by United States officers. In the absence of a fourth amendment violation, I see no basis for holding that the district court possess the inherent power to exclude the evidence seized by United States officers. The majority's ill-advised and unprecedented warrant requirement is diametrically opposed

to fourth amendment jurisprudence. Moreover, I believe that, even if the fifth amendment required exclusion of evidence obtained by means that "shock the conscience," admission of the evidence seized in this case would not violate Verdugo's due process rights at trial.

I would hold, therefore, that it was error for the district court to have suppressed the evidence of the drug tally sheets seized by the DEA agents in Mexico.

I respectfully dissent.